*251 Justice Thomas
delivered the opinion of the Court.
The question presented by this case is whether a provision in a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate claims arising under the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 et seq., is enforceable. The United States Court of Appeals for the Second Circuit held that this Court’s decision in Alexander v. Gardner-Denver Co., 415 U. S. 36 (1974), forbids enforcement of such arbitration provisions. We disagree and reverse the judgment of the Court of Appeals.
I
Respondents are members of the Service Employees International Union, Local 32BJ (Union). Under the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, the Union is the exclusive bargaining representative of employees within the building-services industry in New York City, which includes building cleaners, porters, and doorpersons. See 29 U. S. C. § 159(a). In this role, the Union has exclusive authority to bargain on behalf of its members over their “rates of pay, wages, hours of employment, or other conditions of employment.” Ibid. Since the 193G’s, the Union has engaged in industrywide collective bargaining with the Realty Advisory Board on Labor Relations, Inc. (RAB), a multiemployer bargaining association for the New York City real-estate industry. The agreement between the Union and the RAB is embodied in their Collective Bargaining Agreement for Contractors and Building Owners (CBA). The CBA requires Union members to submit all claims of employment discrimination to binding arbitration under the CBA’s grievance and dispute resolution procedures:
*252 “30. NO DISCRIMINATION
“There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, union membership, or any characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the New York State Human Rights Law, the New York City Human Rights Code, ... or any other similar laws, rules or regulations. AH such claims shall be subject to the grievance and arbitration procedure (Articles V and VI) as the sole and exclusive remedy for violations. Arbitrators shall apply appropriate law in rendering decisions based upon claims of discrimination.” App. to Pet. for Cert. 48a.[1]
Petitioner 14 Penn Plaza LLC is a member of the RAB. It owns and operates the New York City office building where, prior to August 2003, respondents worked as night lobby watchmen and in other similar capacities. Respondents were directly employed by petitioner Temco Service Industries, Inc. (Temco), a maintenance service and cleaning contractor. In August 2003, with the Union’s consent, 14 Penn Plaza engaged Spartan Security, a unionized security services contractor and affiliate of Temco, to provide licensed security guards to staff the lobby and entrances of its building. Because this rendered respondents’ lobby services unnecessary, Temco reassigned them to jobs as night porters *253 and light-duty cleaners in other locations in the building. Respondents contend that these reassignments led to a loss in income, caused them emotional distress, and were otherwise less desirable than their former positions.
At respondents’ request, the Union filed grievances challenging the reassignments. The grievances alleged that petitioners: (1) violated the CBA’s ban on workplace discrimination by reassigning respondents on account of their age; (2) violated seniority rules by failing to promote one of the respondents to a handyman position; and (3) failed to equitably rotate overtime. After failing to obtain relief on any of these claims through the grievance process, the Union requested arbitration under the CBA.
After the initial arbitration hearing, the Union withdrew the first set of respondents’ grievances — the age-discrimination claims — from arbitration. Because it had consented to the contract for new security personnel at 14 Penn Plaza, the Union believed that it could not legitimately object to respondents’ reassignments as discriminatory. But the Union continued to arbitrate the seniority and overtime claims, and, after several hearings, the claims were denied.
In May 2004, while the arbitration was ongoing but after the Union withdrew the age-discrimination claims, respondents filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that petitioners had violated their rights under the ADEA. Approximately one month later, the EEOC issued a Dismissal and Notice of Rights, which explained that the agency’s “‘review of the evidence . . . fail[ed] to indicate that a violation ha[d] occurred,’ ” and notified each respondent of his right to sue. Pyett v. Pennsylvania Building Co., 498 F. 3d 88, 91 (CA2 2007).
Respondents thereafter filed suit against petitioners in the United States District Court for the Southern District of New York, alleging that their reassignment violated the *254 ADEA and state and local laws prohibiting age discrimination.[2] Petitioners filed a motion to compel arbitration of respondents’ claims pursuant to §§ 3 and 4 of the Federal Arbitration Act (FAA), 9 U. S. C. §§ 3, 4.[3] The District Court denied the motion because under Second Circuit precedent, “even a clear and unmistakable union-negotiated waiver of a right to litigate certain federal and state statutory claims in a judicial forum is unenforceable.” App. to Pet. for Cert. 21a. Respondents immediately appealed the ruling under §16 of the FAA, which authorizes an interlocutory appeal of “an order . . . refusing a stay of any action under section 3 of this title” or “denying a petition under section 4 of this title to order arbitration to proceed.” 9 U. S. C. §§16(a)(l)(AMB).
The Court of Appeals affirmed. 498 F. 3d 88. According to the Court of Appeals, it could not compel arbitration of the dispute because Gardner-Denver, which “remains good law,” held “that a collective bargaining agreement could not waive covered workers’ rights to a judicial forum for causes of action created by Congress.” 498 F. 3d, at 92, 91, n. 3 (citing Gardner-Denver, 415 U. S., at 49-51). The Court of Appeals observed that the Gardner-Denver decision was in tension with this Court’s more recent decision in Gilmer v. *255 Interstate/Johnson Lane Corp., 500 U. S. 20 (1991), which “held that an individual employee who had agreed individually to waive his right to a federal forum could be compelled to arbitrate a federal age discrimination claim.” 498 F. 3d, at 91, n. 3 (citing Gilmer, supra, at 33-35; emphasis in original). The Court of Appeals also noted that this Court previously declined to resolve this tension in Wright v. Universal Maritime Service Corp., 525 U. S. 70, 82 (1998), where the waiver at issue was not “clear and unmistakable.” 498 F. 3d, at 91, n. 3.
The Court of Appeals attempted to reconcile Gardner-Denver and Gilmer by holding that arbitration provisions in a collective-bargaining agreement, “which purport to waive employees’ rights to a federal forum with respect to statutory claims, are unenforceable.” 498 F. 3d, at 93-94. As a result, an individual employee would be free to choose compulsory arbitration under Gilmer, but a labor union could not collectively bargain for arbitration on behalf of its members. We granted certiorari, 552 U. S. 1178 (2008), to address the issue left unresolved in Wright, which continues to divide the Courts of Appeals,[4] and now reverse.
II
A
The NLRA governs federal labor-relations law. As permitted by that statute, respondents designated the Union as their “exclusive representative] ... for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.” 29 U. S. C. § 159(a). As the employees’ exclusive bargaining representative, the Union “enjoys broad authority ... in the *256 negotiation and administration of [the] collective bargaining contract.” Communications Workers v. Beck, 487 U. S. 735, 739 (1988) (internal quotation marks omitted). But this broad authority “is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation.” Humphrey v. Moore, 375 U. S. 335, 342 (1964). The employer has a corresponding duty under the NLRA to bargain in good faith “with the representatives of his employees” on wages, hours, and conditions of employment. 29 U. S. C. § 158(a)(5); see also § 158(d).
In this instance, the Union and the RAB, negotiating on behalf of 14 Penn Plaza, collectively bargained in good faith and agreed that employment-related discrimination claims, including claims brought under the ADEA, would be resolved in arbitration. This freely negotiated term between the Union and the RAB easily qualifies as a “conditio[n] of employment” that is subject to mandatory bargaining under § 159(a). See Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB, 501 U. S. 190, 199 (1991) (“[A]rrangements for arbitration of disputes are a term or condition of employment and a mandatory subject of bargaining”); Steelworkers v. Warrior & Gulf Nav. Co., 363 U. S. 574, 578 (1960) (“[Arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself”); Textile Workers v. Lincoln Mills of Ala., 353 U. S. 448, 455 (1957) (“Plainly the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike”). The decision to fashion a collective-bargaining agreement to require arbitration of employment-discrimination claims is no different from the many other decisions made by parties in designing grievance machinery.[5]
*257 Respondents, however, contend that the arbitration clause here is outside the permissible scope of the collective-bargaining process because it affects the “employees’ individual, non-economic statutory rights.” Brief for Respondents 22; see also post, at 281-283 (Souter, J., dissenting). We disagree. Parties generally favor arbitration precisely because of the economics of dispute resolution. See Circuit City Stores, Inc. v. Adams, 532 U. S. 105, 123 (2001) (“Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts”). As in any contractual negotiation, a union may agree to the inclusion of an arbitration provision in a collective-bargaining agreement in return for other concessions from the employer. Courts generally may not interfere in this bargained-for exchange. “Judicial nullification of contractual concessions ... is contrary to what the Court has recognized as one of the fundamental policies of the National Labor Relations Act — freedom of contract.” NLRB v. Magnavox Co., 415 U. S. 322, 328 (1974) (Stewart, J., concurring in part and dissenting in part) (internal quotation marks and brackets omitted).
As a result, the CBA’s arbitration provision must be honored unless the ADEA itself removes this particular class of *258 grievances from the NLRA’s broad sweep. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 628 (1985). It does not. This Court has squarely held that the ADEA does not preclude arbitration of claims brought under the statute. See Gilmer, 500 U. S., at 26-33.
In Gilmer, the Court explained that “[although all statutory claims may not be appropriate for arbitration, ‘[hjaving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.’ ” Id., at 26 (quoting Mitsubishi Motors Corp., supra, at 628). And “[i]f Congress intended the substantive protection afforded by the ADEA to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.” 500 U. S., at 29 (internal quotation marks and some brackets omitted). The Court determined that “nothing in the text of the ADEA or its legislative history explicitly precludes arbitration.” Id., at 26-27. The Court also concluded that arbitrating ADEA disputes would not undermine the statute’s “remedial and deterrent function.” Id., at 28 (internal quotation marks omitted). In the end, the employee’s “generalized attacks” on “the adequacy of arbitration procedures” were “insufficient to preclude arbitration of statutory claims,” id., at 30, because there was no evidence that “Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act,” id., at 35.
The Gilmer Court’s interpretation of the ADEA fully applies in the collective-bargaining context. Nothing in the law suggests a distinction between the status of arbitration agreements signed by an individual employee and those agreed to by a union representative. This Court has required only that an agreement to arbitrate statutory antidiscrimination claims be “explicitly stated” in the collective-bargaining agreement. Wright, 525 U. S., at 80 (internal *259 quotation marks omitted). The CBA under review here meets that obligation. Respondents incorrectly counter that an individual employee must personally “waive” a “[substantive] right” to proceed in court for a waiver to be “knowing and voluntary” under the ADEA. 29 U. S. C. § 626(f)(1). As explained below, however, the agreement to arbitrate ADEA claims is not the waiver of a “substantive right” as that term is employed in the ADEA. Wright, supra, at 80; see infra, at 265-266. Indeed, if the “right” referred to in § 626(f)(1) included the prospective waiver of the right to bring an ADEA claim in court, even a waiver signed by an individual employee would be invalid as the statute also prevents individuals from “waiving] rights or claims that may arise after the date the waiver is executed.” § 626(f)(1)(C).[6]
*260 Examination of the two federal statutes at issue in this ease, therefore, yields a straightforward answer to the question presented: The NLRA provided the Union and the RAB with statutory authority to collectively bargain for arbitration of workplace discrimination claims, and Congress did not terminate that authority with respect to federal age-discrimination claims in the ADEA. Accordingly, there is no legal basis for the Court to strike down the arbitration clause in this CBA, which was freely negotiated by the Union and the RAB, and which clearly and unmistakably requires respondents to arbitrate the age-discrimination claims at issue in this appeal. Congress has chosen to allow arbitration of ADEA claims. The Judiciary must respect that choice.
B
The CBA’s arbitration provision is also fully enforceable under the Gardner-Denver line of cases. Respondents interpret Gardner-Denver and its progeny to hold that “a union cannot waive an employee’s right to a judicial forum under the federal antidiscrimination statutes” because “allowing the union to waive this right would substitute the union’s interests for the employee’s antidiscrimination rights.” Brief for Respondents 12. The “combination of union control over the process and inherent conflict of interest with respect to discrimination claims,” they argue, “provided the foundation for the Court’s holding [in Gardner-Denver] that arbitration under a collective bargaining agreement could not preclude an individual employee’s right to bring a lawsuit in court to vindicate a statutory discrimination claim.” Id., at 15. We disagree.
1
The holding of Gardner-Denver is not as broad as respondents suggest. The employee in that case was covered by a *261 collective-bargaining agreement that prohibited “discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry” and that guaranteed that “[n]o employee will be discharged ... except for just cause.” 415 U. S., at 39 (internal quotation marks omitted). The agreement also included a “multistep grievance procedure” that culminated in compulsory arbitration for any “differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement” and “any trouble aris[ing] in the plant.” Id., at 40-41 (internal quotation marks omitted).
The employee was discharged for allegedly producing too many defective parts while working for the respondent as a drill operator. He filed a grievance with his union claiming that he was “ ‘unjustly discharged’ ” in violation of the “ ‘just cause’” provision within the collective-bargaining agreement. Id., at 39, 42. Then at the final prearbitration step of the grievance process, the employee added a claim that he was discharged because of his race. Id., at 38-42.
The arbitrator ultimately ruled that the employee had been “ ‘discharged for just cause,’ ” but “made no reference to [the] claim of racial discrimination.” Id., at 42. After obtaining a right-to-sue letter from the EEOC, the employee filed a claim in Federal District Court, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964. The District Court issued a decision, affirmed by the Court of Appeals, which granted summary judgment to the employer because it concluded that “the claim of racial discrimination had been submitted to the arbitrator and resolved adversely to [the employee].” Id., at 43. In the District Court’s view, “having voluntarily elected to pursue his grievance to final arbitration under the nondiscrimination clause of the collective-bargaining agreement,” the employee was “bound by the arbitral decision” and precluded from suing his employer on any other grounds, such as a statutory claim under Title VII. Ibid.
*262 This Court reversed the judgment on the narrow ground that the arbitration was not preclusive because the collective-bargaining agreement did not cover statutory claims. As a result, the lower courts erred in relying on the “doctrine of election of remedies” to bar the employee’s Title VII claim. Id., at 49. “That doctrine, which refers to situations where an individual pursues remedies that are legally or factually inconsistent” with each other, did not apply to the employee’s dual pursuit of arbitration and a Title VII discrimination claim in district court. Ibid. The employee’s collective-bargaining agreement did not mandate arbitration of statutory antidiscrimination claims. Id., at 49-50. “As the proctor of the bargain, the arbitrator’s task is to effectuate the intent of the parties.” Id., at 53. Because the collective-bargaining agreement gave the arbitrator “authority to resolve only questions of contractual rights,” his decision could not prevent the employee from bringing the Title VII claim in federal court “regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.” Id., at 53-54; see also id., at 50.
The Court also explained that the employee had not waived his right to pursue his Title VII claim in federal court by participating in an arbitration that was premised on the same underlying facts as the Title VII claim. See id., at 52. Thus, whether the legal theory of preclusion advanced by the employer rested on “the doctrines of election of remedies” or was recast “as resting instead on the doctrine of equitable estoppel and on themes of res judicata and collateral estoppel,” id., at 49, n. 10 (internal quotation marks omitted), it could not prevail in light of the collective-bargaining agreement’s failure to address arbitration of Title VII claims. See id., at 46, n. 6 (“[W]e hold that the federal policy favoring arbitration does not establish that an arbitrator’s resolution of a contractual claim is dispositive of a statutory claim under Title VII” (emphasis added)).
*263 The Court’s decisions following Gardner-Denver have not broadened its holding to make it applicable to the facts of this case. In Barrentine v. Arkansas-Best Freight System, Inc., 450 U. S. 728 (1981), the Court considered “whether an employee may bring an action in federal district court, alleging a violation of the minimum wage provisions of the Fair Labor Standards Act,... after having unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee pursuant to the provisions of his union’s collective-bargaining agreement.” Id., at 729-730. The Court held that the unsuccessful arbitration did not preclude the federal lawsuit. Like the collective-bargaining agreement in Gardner-Denver, the arbitration provision under review in Barrentine did not expressly reference the statutory claim at issue. See 450 U. S., at 731, n. 5. The Court thus reiterated that an “arbitrator’s power is both derived from, and limited by, the collective-bargaining agreement” and “[h]is task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties.” Id., at 744.
McDonald v. West Branch, 466 U. S. 284 (1984), was decided along similar lines. The question presented in that case was “whether a federal court may accord preclusive effect to an unappealed arbitration award in a case brought under [42 U. S. C. § 1983].” Id., at 285. The Court declined to fashion such a rule, again explaining that “because an arbitrator’s authority derives solely from the contract, Barren-tine, supra, at 744, an arbitrator may not have the authority to enforce § 1983” when that provision is left unaddressed by the arbitration agreement. Id., at 290. Accordingly, as in both Gardner-Denver and Barrentine, the Court’s decision in McDonald hinged on the scope of the collective-bargaining agreement and the arbitrator’s parallel mandate.
The facts underlying Gardner-Denver, Barrentine, and McDonald reveal the narrow scope of the legal rule arising from that trilogy of decisions. Summarizing those opinions *264 in Gilmer, this Court made clear that the Gardner-Denver line of cases “did not involve the issue of the enforceability of an agreement to arbitrate statutory claims.” 500 U. S., at 35. Those decisions instead “involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory, claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions.” Ibid.; see also Wright, 525 U. S., at 76; Livadas v. Bradshaw, 512 U. S. 107, 127, n. 21 (1994).[7] Gardner-Denver and its progeny thus do not control the outcome where, as is the case here, the collective-bargaining agreement’s arbitration provision expressly covers both statutory and contractual discrimination claims.[8]
*265 2
We recognize that apart from their narrow holdings, the Gardner-Denver line of cases included broad dicta that were highly critical of the use of arbitration for the vindication of statutory antidiscrimination rights. That skepticism, however, rested on a misconceived view of arbitration that this Court has since abandoned.
First, the Court in Gardner-Denver erroneously assumed that an agreement to submit statutory discrimination claims to arbitration was tantamount to a waiver of those rights. See 415 U. S., at 51 (“[T]here can be no prospective waiver of an employee’s rights under Title VII” (emphasis added)). For this reason, the Court stated, “the rights conferred [by Title VII] can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII.” Ibid.; see also id., at 56 (“[W]e have long recognized that The choice of forums inevitably affects the scope of the substantive right to be vindicated’ ” (quoting U. S. Bulk Carriers, Inc. v. Arguelles, 400 U. S. 351, 359-360 (1971) (Harlan, J., concurring))).
The Court was correct in concluding that federal antidiscrimination rights may not be prospectively waived, see 29 U. S. C. § 626(f)(1)(C); see supra, at 259, but it confused an agreement to arbitrate those statutory claims with a prospective waiver of the substantive right. The decision to resolve ADEA claims by way of arbitration instead of litigation does not waive the statutory right to be free from workplace age discrimination; it waives only the right to seek re *266 lief from a court in the first instance. See Gilmer, supra, at 26 (‘“[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum’” (quoting Mitsubishi Motors Corp., 473 U. S., at 628)). This “Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law.” Circuit City Stores, Inc., 532 U. S., at 123. The suggestion in Gardner-Denver that the decision to arbitrate statutory discrimination claims was tantamount to a substantive waiver of those rights, therefore, reveals a distorted understanding of the compromise made when an employee agrees to compulsory arbitration.
In this respect, Gardner-Denver is a direct descendant of the Court’s decision in Wilko v. Swan, 346 U. S. 427 (1953), which held that an agreement to arbitrate claims under the Securities Act of 1933 was unenforceable. See id., at 438. The Court subsequently overruled Wilko and, in so doing, characterized the decision as “pervaded by . . . ‘the old judicial hostility to arbitration.’” Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U. S. 477, 480 (1989). The Court added: “To the extent that Wilko rested on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants, it has fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.” Id., at 481; see also Mitsubishi Motors Corp., supra, at 626-627 (“[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution”). The timeworn “mistrust of the arbitral process” harbored by the Court in Gardner-Denver thus weighs against reliance on *267 anything more than its core holding. Shearson/American Express Inc. v. McMahon, 482 U. S. 220, 231-232 (1987); see also Gilmer, 500 U. S., at 34, n. 5 (reiterating that Gardner-Denver’s view of arbitration “has been undermined by [the Court’s] recent arbitration decisions”). Indeed, in light of the “radical change, over two decades, in the Court’s receptivity to arbitration,” Wright, 525 U. S., at 77, reliance on any judicial decision similarly littered with Wilko’s overt hostility to the enforcement of arbitration agreements would be ill advised.[9]
*268 Second, Gardner-Denver mistakenly suggested that certain features of arbitration made it a forum “well suited to the resolution of contractual disputes,” but “a comparatively inappropriate forum for the final resolution of rights created by Title VII.” 415 U. S., at 56. According to the Court, the “factfinding process in arbitration” is “not equivalent to judicial factfinding” and the “informality of arbitral procedure . . . makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts.” Id., at 57, 58. The Court also questioned the competence of arbitrators to decide federal statutory claims. See id., at 57 (“[T]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land”); Barrentine, 450 U. S., at 743 (“Although an arbitrator may be competent to resolve many preliminary factual questions, such as whether the employee ‘punched in’ when he said he did, he may lack the competence to decide the ultimate legal issue whether an employee’s right to a minimum wage or to overtime pay under the statute has been violated”). In the Court’s view, “the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts.” Gardner-Denver, supra, at 57; see also McDonald, 466 U. S., at 290 (“An arbitrator may not . . . have the expertise required to resolve the complex legal questions that arise in § 1983 actions”).
These misconceptions have been corrected. For example, the Court has “recognized that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims, notwithstanding the absence of judicial instruction and supervision” and that “there is no reason to assume at the outset that arbitrators will not follow the law.” McMahon, supra, at 232; Mitsubishi Motors Corp., 473 U. S., at 634 (“We decline to indulge the presumption that the parties *269 and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators”). An arbitrator’s capacity to resolve complex questions of fact and law extends with equal force to discrimination claims brought under the ADEA. Moreover, the recognition that arbitration procedures are more streamlined than federal litigation is not a basis for finding the forum somehow inadequate; the relative informality of arbitration is one of the chief reasons that parties select arbitration. Parties “trad[e] the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.” Id., at 628. In any event, “[i]t is unlikely . .. that age discrimination claims require more extensive discovery than other claims that we have found to be arbitrable, such as [Racketeer Influenced and Corrupt Organizations Act] and antitrust claims.” Gilmer, supra, at 31. At bottom, objections centered on the nature of arbitration do not offer a credible basis for discrediting the choice of that forum to resolve statutory antidiscrimination claims.[10]
Third, the Court in Gardner-Denver raised in a footnote a “further concern” regarding “the union’s exclusive control over the manner and extent to which an individual grievance is presented.” 415 U. S., at 58, n. 19. The Court suggested that in arbitration, as in the collective-bargaining process, a union may subordinate the interests of an individual employee to the collective interests of all employees in the bargaining unit. Ibid.; see also McDonald, supra, at 291 (“The union’s interests and those of the individual employee are not always identical or even compatible. As a result, the *270 union may present the employee’s grievance less vigorously, or make different strategic choices, than would the employee”); see also Barrentine, supra, at 742; post, at 284, n. 4 (Souter, J., dissenting).
We cannot rely on this judicial policy concern as a source of authority for introducing a qualification into the ADEA that is not found in its text. Absent a constitutional barrier, “it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress.” Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U. S. 33, 52 (2008) (internal quotation marks omitted). Congress is fully equipped “to identify any category of claims as to which agreements to arbitrate will be held unenforceable.” Mitsubishi Motors Corp., supra, at 627. Until Congress amends the ADEA to meet the conflict-of-interest concern identified in the Gardner-Denver dicta, and seized on by respondents here, there is “no reason to color the lens through which the arbitration clause is read” simply because of an alleged conflict of interest between a union and its members. Mitsubishi Motors Corp., supra, at 628. This is a “battl[e] that should be fought among the political branches and the industry. Those parties should not seek to amend the statute by appeal to the Judicial Branch.” Barnhart v. Sigmon Coal Co., 534 U. S. 438, 462 (2002).
The conflict-of-interest argument also proves too much. Labor unions certainly balance the economic interests of some employees against the needs of the larger work force as they negotiate collective-bargaining agreements and implement them on a daily basis. But this attribute of organized labor does not justify singling out an arbitration provision for disfavored treatment. This “principle of majority rule” to which respondents object is in fact the central premise of the NLRA. Emporium Capwell Co. v. Western Addition Community Organization, 420 U. S. 50, 62 (1975). “In establishing a regime of majority rule, Congress sought to secure to all members of the unit the benefits of their collec *271 tive strength and bargaining power, in full awareness that the superior strength of some individuals or groups might be subordinated to the interest of the majority.” Ibid, (footnote omitted); see also Ford Motor Co. v. Huffman, 345 U. S. 330, 338 (1953) (“The complete satisfaction of all who are represented is hardly to be expected”); Pennsylvania R. Co. v. Rychlik, 352 U. S. 480, 498 (1957) (Frankfurter, J., concurring). It was Congress’ verdict that the benefits of organized labor outweigh the sacrifice of individual liberty that this system necessarily demands. Respondents’ argument that they were deprived of the right to pursue their ADEA claims in federal court by a labor union with a conflict of interest is therefore unsustainable; it amounts to a collateral attack on the NLRA.
In any event, Congress has accounted for this conflict of interest in several ways. As indicated above, the NLRA has been interpreted to impose a “duty of fair representation” on labor unions, which a union breaches “when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith.” Marquez v. Screen Actors, 525 U. S. 33, 44 (1998). This duty extends to “challenges leveled not only at a union’s contract administration and enforcement efforts but at its negotiation activities as well.” Beck, 487 U. S., at 743 (citation omitted). Thus, a union is subject to liability under the NLRA if it illegally discriminates against older workers in either the formation or governance of the collective-bargaining agreement, such as by deciding not to pursue a grievance on behalf of one of its members for discriminatory reasons. See Vaca v. Sipes, 386 U. S. 171, 177 (1967) (describing the duty of fair representation as the “statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct” (emphasis added)). Respondents in fact brought a fair representation suit against the Union based on its withdrawal of support for their age- *272 discrimination claims. See n. 2, supra. Given this avenue that Congress has made available to redress a union’s violation of its duty to its members, it is particularly inappropriate to ask this Court to impose an artificial limitation on the collective-bargaining process.
In addition, a union is subject to liability under the ADEA if the union itself discriminates against its members on the basis of age. See 29 U. S. C. § 623(d); see also 1 B. Lindemann & P. Grossman, Employment Discrimination Law 1575-1581 (4th ed. 2007) (explaining that a labor union may be held jointly liable with an employer under federal antidiscrimination laws for discriminating in the formation of a collective-bargaining agreement, knowingly acquiescing in the employer’s discrimination, or inducing the employer to discriminate); cf. Goodman v. Lukens Steel Co., 482 U. S. 656, 669 (1987). Union members may also file age-discrimination claims with the EEOC and the National Labor Relations Board, which may then seek judicial intervention under this Court’s precedent. See EEOC v. Waffle House, Inc., 534 U. S. 279, 295-296 (2002). In sum, Congress has provided remedies for the situation where a labor union is less than vigorous in defense of its members’ claims of discrimination under the ADEA.
Ill
Finally, respondents offer a series of arguments contending that the particular CBA at issue here does not clearly and unmistakably require them to arbitrate their ADEA claims. See Brief for Respondents 44-47. But respondents did not raise these contract-based arguments in the District Court or the Court of Appeals. To the contrary, respondents acknowledged on appeal that the CBA provision requiring arbitration of their federal antidiscrimination statutory claims “is sufficiently explicit” in precluding their federal lawsuit. Brief for Plaintiffs-Appellees in No. 06-3047-cv(L) etc. (CA2), p. 9. In light of respondents’ litigating position, both lower courts assumed that the CBA's arbitration clause *273 clearly applied to respondents and proceeded to decide the question left unresolved in Wright. We granted review of the question presented on that understanding.
“Without cross-petitioning for certiorari, a prevailing party may, of course, ‘defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals.’ ” Granfinanciera, S. A. v. Nordberg, 492 U. S. 33, 38-39 (1989) (quoting Washington v. Confederated Bands and Tribes of Yakima Nation, 439 U. S. 463, 476, n. 20 (1979)). But this Court will affirm on grounds that have “‘not been raised below . . . “only in exceptional cases.” ’ ” Nordberg, supra, at 39 (quoting Heckler v. Campbell, 461 U. S. 458, 468-469, n. 12 (1983)). This is not an “exceptional case.” As a result, we find that respondents’ alternative arguments for affirmance have been forfeited. See, e. g., Rita v. United States, 551 U. S. 338, 360 (2007); Sprietsma v. Mercury Marine, 537 U. S. 51, 56, n. 4 (2002). We will not resurrect them on respondents’ behalf.
Respondents also argue that the CBA operates as a substantive waiver of their ADEA rights because it not only precludes a federal lawsuit, but also allows the Union to block arbitration of these claims. Brief for Respondents 28-30. Petitioners contest this characterization of the CBA, see Reply Brief for Petitioners 23-27, and offer record evidence suggesting that the Union has allowed respondents to continue with the arbitration even though the Union has declined to participate, see App. to Pet. for Cert. 42a. But not only does this question require resolution of contested factual allegations, it was not fully briefed to this or any court and is not fairly encompassed within the question presented, see this Court’s Rule 14.1(a). Thus, although a substantive waiver of federally protected civil rights will not be upheld, see Mitsubishi Motors Corp., 473 U. S., at 637, and n. 19; Gilmer, 500 U. S., at 29, we are not positioned to resolve in the first instance whether the CBA allows the Union *274 to prevent respondents from “effectively vindicating” their “federal statutory rights in the arbitral forum,” Green Tree Financial Corp.-Ala. v. Randolph, 531 U. S. 79, 90 (2000). Resolution of this question at this juncture would be particularly inappropriate in light of our hesitation to invalidate arbitration agreements on the basis of speculation. See id., at 91.
IV
We hold that a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate ADEA claims is enforceable as a matter of federal law. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Article V establishes the grievance process, which applies to all claims regardless of whether they are subject to arbitration under the CBA. Article VI establishes the procedures for arbitration and postarbitration judicial review, and, in particular, provides that the arbitrator “shall... decide all differences arising between the parties as to interpretation, application or performance of any part of this Agreement and such other issues as the parties are expressly required to arbitrate before him under the terms of this Agreement.” App. to Pet. for Cert. 43a-47a.

 Respondents also filed a “hybrid” lawsuit against the Union and petitioners under §301 of the Labor Management Relations Act, 1947, 29 U. S. C. § 185, see also DelCostello v. Teamsters, 462 U. S. 151, 164-165 (1983), alleging that the Union breached its “duty of fair representation” under the NLRA by withdrawing support for the age-discrimination claims during the arbitration and that petitioners breached the CBA by reassigning respondents. Respondents later voluntarily dismissed this suit with prejudice.

 Petitioners also filed a motion to dismiss the complaint for failure to state a claim. The District Court denied the motion, holding that respondents had sufficiently alleged an ADEA claim by claiming that they “were over the age of 40,... they were reassigned to positions which led to substantial losses in income, and . . . their replacements were both younger and had less seniority at the building.” App. to Pet. for Cert. 20a (footnote omitted). Petitioners have not appealed that ruling.

 Compare, e. g., Rogers v. New York Univ., 220 F. 3d 73, 75 (CA2 2000) (per curiam); O’Brien v. Agawam, 350 F. 3d 279, 285 (CA1 2003); Mitchell v. Chapman, 343 F. 3d 811, 824 (CA6 2003); Tice v. American Airlines, Inc., 288 F. 3d 313, 317 (CA7 2002), with, e. g., Eastern Associated Coal Corp. v. Massey, 373 F. 3d 530, 533 (CA4 2004).

 Justice Souter claims that this understanding is “impossible to square with our conclusion in [Alexander v.] Gardner-Denver [Co., 415 U. S. 36 (1974),] that ‘Title VII... stands on plainly different ground’ from ‘statutory rights related to collective activity’: ‘it concerns not majoritarian processes, but an individual’s right to equal employment opportuni *257 ties.’ ” Post, at 282 (dissenting opinion) (quoting Gardner-Denver, supra, at 51). As explained below, however, Justice Souter repeats the key analytical mistake made in Gardner-Denver’s dicta by equating the decision to arbitrate Title VII and ADEA claims to a decision to forgo these substantive guarantees against workplace discrimination. See infra, at 265-267. The right to a judicial forum is not the nonwaivable “substantive” right protected by the ADEA. See infra, at 259. Thus, although Title VII and ADEA rights may well stand on “different ground” than statutory rights that protect “majoritarian processes,” Gardner-Denver, supra, at 51, the voluntary decision to collectively bargain for arbitration does not deny those statutory antidiscrimination rights the full protection they are due.

 Respondents’ contention that § 118 of the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1081, note following 42 U.S.C. §1981 (2000 ed.), precludes the enforcement of this arbitration agreement also is misplaced. See Brief for Respondents 31-32. Section 118 expresses Congress’ support for alternative dispute resolution: “Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under” the ADEA. 105 Stat. 1081, note following 42 U. S C. § 1981. Respondents argue that the legislative history actually signals Congress’ intent to preclude arbitration waivers in the collective-bargaining context. In particular, respondents point to a House Report that, in spite of the statute’s plain language, interprets § 118 to support their position. See H. R. Rep. No. 102-40, pt. 1, p. 97 (1991) (“[A]ny agreement to submit disputed issues to arbitration ... in the context of a collective bargaining agreement. . . does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court’s interpretation of Title VII in Alexander v. Gardner-Denver Co., 415 U. S. 36 (1974)”). But the legislative history miseharacterizes the holding of Gardner-Denver, which does not prohibit collective bargaining for arbitration of ADEA claims. See infra, at 260-264. Moreover, reading the legislative history in the manner suggested by respondents would create a direct conflict with the statutory text, which encourages the use of arbitration for dispute resolution without imposing any constraints on collective bargaining. In such a contest, the *260 text must prevail. See Ratzlaf v. United States, 510 U. S. 135, 147-148 (1994) (“[W]e do not resort to legislative history to cloud a statutory text that is clear”).

 Justice Souter’s reliance on Wright v. Universal Maritime Service Corp., 525 U. S. 70 (1998), to support its view of Gardner-Denver is misplaced. See post, at 281, 283. Wright identified the “tension” between the two lines of cases represented by Gardner-Denver and Gilmer, but found “it unnecessary to resolve the question of the validity of a union-negotiated waiver, since it [was] apparent... on the facts and arguments presented . . . that no such waiver [had] occurred.” 525 U. S., at 76-77. And although his dissent describes Wrights characterization of Gardner-Denver as “raising a ‘seemingly absolute prohibition of union waiver of employees’ federal forum rights,’ ” post, at 283 (quoting Wright, 525 U. S., at 80), it wrenches the statement out of context: “Although [the right to a judicial forum] is not a substantive right, see Gilmer, 500 U. S., at 26, and whether or not Gardner-Denver’s, seemingly absolute prohibition of union waiver of employees’ federal forum rights survives Gilmer, Gardner-Denver at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA,” id., at 80 (emphasis added). Wright therefore neither endorsed Gardner-Denver’s, broad language nor suggested a particular result in this case.

 Because today’s decision does not contradict the holding of Gardner-Denver, we need not resolve the stare decisis concerns raised by the dissenting opinions. See post, at 280-281, 285-286 (opinion of Souter, J.); post, at 275-277 (opinion of Stevens, J.). But given the development of *265 this Court’s arbitration jurisprudence in the intervening years, see infra, at 266-269, Gardner-Denver would appear to be a strong candidate for overruling if the dissents’ broad view of its holding, see post, at 282-283 (opinion of Souter, J.), were correct. See Patterson v. McLean Credit Union, 491 U. S. 164, 173 (1989) (explaining that it is appropriate to overrule a decision where there “has been [an] intervening development of the law” such that the earlier “decision [is] irreconcilable with competing legal doctrines or policies”).

 Justice Stevens suggests that the Court is displacing its “earlier determination of the relevant provisions’ meaning” based on a “preference for arbitration.” Post, at 275. But his criticism lacks any basis. We are not revisiting a settled issue or disregarding an earlier determination; the Court is simply deciding the question identified in Wright as unresolved. See supra, at 255; see also infra, at 272-273. And, contrary to Justice Stevens’ accusation, it is the Court’s fidelity to the ADEA’s text — not an alleged preference for arbitration — that dictates the answer to the question presented. As Gilmer explained, nothing in the text of Title VII or the ADEA precludes contractual arbitration, see supra, at 258, and Justice Stevens has never suggested otherwise. Rather, he has always contended that permitting the “compulsory arbitration” of employment-discrimination claims conflicts with his perception of “the congressional purpose animating the ADEA.” Gilmer, 500 U. S., at 41 (Stevens, J., dissenting); see also id., at 42 (“Plainly, it would not comport with the congressional objectives behind a statute seeking to enforce civil rights protected by Title VII to allow the very forces that had practiced discrimination to contract away the right to enforce civil rights in the courts” (internal quotation marks omitted)). The Gilmer Court did not adopt Justice Stevens’ personal view of the purposes underlying the ADEA, for good reason: That view is not embodied within the statute’s text. Accordingly, it is not the statutory text that Justice Stevens has sought to vindicate — it is instead his own “preference” for mandatory judicial review, which he disguises as a search for congressional purpose. This Court is not empowered to incorporate such a preference into the text of a federal statute. See infra, at 270. It is for this reason, and not because of a “policy favoring arbitration,” see post, at 274, 275 (Stevens, J., dissenting), that the Court overturned Wilko v. Swan, 346 U. S. 427 (1953). And it is why we disavow the antiarbitration dicta of Gardner-Denver and its progeny today.

 Moreover, an arbitrator’s decision as to whether a unionized employee has been discriminated against on the basis of age in violation of the ADEA remains subject to judicial review under the FA A. 9 U. S. C. § 10(a). “[Although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute.” Shearson/American Express Inc. v. McMahon, 482 U. S. 220, 232 (1987).