# United States Court of Appeals
## For the First Circuit

No. 16-1161

PRIME HEALTHCARE SERVICES - LANDMARK LLC,

Plaintiff, Appellee,

v.

UNITED NURSES AND ALLIED PROFESSIONALS, LOCAL 5067,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald L. Lagueux, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Christopher Callaci, for appellant.
David C. Casey, with whom Jillian S. Folger-Hartwell and
Littler Mendelson, P.C. were on brief, for appellee.

February 3, 2017

**TORRUELLA**, **Circuit Judge**.  This appeal requires us to decide whether a dispute between employees and their successor employer should be resolved in arbitration or in the courts.  The parties agreed to arbitrate this dispute.  The district court, however, refused to compel arbitration; it found that ERISA preempted arbitration of this dispute, and reasoned that this, in turn, presented an issue of arbitrability properly decided by a judge, not an arbitrator.  Because we find that the issue of ERISA preemption in this case is not an issue of arbitrability, but rather one that is squarely for the arbitrator to decide, we reverse.

## I.  Background

Plaintiff-Appellee Prime Healthcare Services ("Prime") purchased Landmark Medical Center ("Landmark"), a financially-troubled hospital in Woonsocket, Rhode Island, in December 2013.  Defendant-Appellant United Nurses and Allied Professionals, Local 5067 ("Union") is a union local which represented Landmark's employees pursuant to a collective bargaining agreement.

In 2006, Landmark and the Union entered into a collective bargaining agreement ("Landmark CBA"), in effect until 2009, renewed automatically each year unless either party reopened. This CBA contained a grievance and arbitration clause that provided that any unresolved disputes "concerning the interpretation,

-2-

application or meaning" of the CBA could be submitted to arbitration with the American Arbitration Association. This CBA also contained a pension provision, which stated, in relevant part:

> The Employer [Landmark] and the Union agree that, if during the term of this Agreement the Employer sells more than fifty (50) percent of its assets, the Employer may terminate the Landmark Medical Center Retirement Plan for Union Employees in accordance with the requirements of ERISA. The Union acknowledges and agrees it is clearly and unmistakably waiving any and all rights it has or may have to bargain with the Employer over any aspect of the termination, provided such termination shall not reduce benefits accrued by any participant in the Landmark Medical Center Retirement Plan for Union Employees as of the date of termination.

In June 2008, Landmark was placed under the oversight of a Temporary Special Master by the Providence Superior Court due to its financial woes.

In 2012, Prime made an offer to take over Landmark. Prime met with the Union and agreed that it would take over Landmark's contract with its employees.

On October 10, 2012, Prime and the Union signed a cover memorandum ("Cover Memorandum") and accompanying contract ("Prime CBA"). The Cover Memorandum provided that "Prime shall recognize and continue to process any and all grievances and/or labor arbitrations pending at the time of the closing pursuant to the CBAs referenced herein". The Cover Memorandum also stipulated that in the event of inconsistencies between the Cover Memorandum

and the Asset Purchase Agreement (that was yet to be concluded and approved by the court), the Cover Memorandum would govern. The Prime CBA contained the same grievance/arbitration clause as the Landmark CBA.

On June 5, 2013, the Pension Benefit Guarantee Corporation ("PBGC") announced its intention to involuntarily terminate Landmark's defined benefit retirement plan because Landmark had failed to maintain the minimum funding requirements.[1] The termination was completed the following week.

On July 1, 2013, the Union filed a grievance against Landmark alleging a violation of the pension provision of the Landmark CBA. The grievance was denied, and the Union demanded arbitration.

On July 8, 2013, the Providence Superior Court authorized Landmark to execute the termination agreement. The Court also ruled that "any and all rights and remedies of [the Union] with respect to the employee retirement benefits are reserved." The PBGC and the Special Master then entered into an Agreement for Appointment of Trustee and Termination of Plan.

---

[1] A detailed description of the PBGC and its functions has been offered by the court below. See Prime Healthcare Servs., LLC -- Landmark v. United Nurses & Allied Prof'ls, Local 5067, 158 F. Supp. 3d 60, 62-97. See also United Steelworkers of America v. United Eng'g, Inc., 52 F.3d 1386 (6th Cir. 1995).

-4-

This Agreement conveyed all assets of the retirement plan to the PBCG, and provided, inter alia, that any asset purchase agreement that the Special Master entered into could not include assumption of the retirement plan.

In October 2013, the Union amended its grievance against Landmark to state: "The employer violated the governing Collective [B]argaining Agreement . . . when it changed the terms of the defined pension benefit provisions and ceased making contributions to employees [sic] pensions". Landmark denied this amended grievance, too, and the Union filed a request for arbitration on November 8, 2013.

On November 26, 2013, Prime entered into the Asset Purchase Agreement with the Special Master to purchase Landmark. This court-approved Agreement stated that Prime would not assume or be responsible for "any Liability under any Benefit Plan and all administrative costs associated therewith."

On December 31, 2013, when the Asset Purchase Agreement became effective, Landmark terminated all of its employees. On January 1, 2014, some of these employees were hired back by Prime, and the Prime CBA took effect.

On May 5, 2014, Prime filed a Petition for Declaratory Judgment in the United States District Court for the District of Rhode Island. Prime sought, inter alia, to stay arbitration.

In June 2014, the Union filed another grievance against Prime, stating that it violated the 2012 Cover Memorandum by refusing to submit the Union's pending grievance to arbitration.

On January 21, 2016, the District Court for the District of Rhode Island (Lagueux, J.) ruled, on summary judgment, for Prime on the grounds that ERISA preempted the Union's claims (and any matters relating to the Retirement Plan).

This appeal timely followed.

## II. <u>Standard of Review</u>

"Summary judgment is appropriate when the record shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Farmers Ins. Exch.</u> v. <u>RNK, Inc.</u>, 632 F.3d 777, 782 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "We review <u>de novo</u> the grant of a motion for summary judgment." <u>Id.</u> at 782. "[W]e may affirm the entry of summary judgment 'on any ground made manifest by the record,' so long as the record 'reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Batista</u> v. <u>Cooperativa de Vivienda Jardines de San Ignacio</u>, 776 F.3d 38, 42 (1st Cir. 2015) (citations omitted).

As neither party disputes any material facts, our review focuses solely on whether the movant was entitled to judgment as a matter of law.

### III. **Discussion**

The issue before us is whether an arbitrator or a court should resolve the present dispute. This issue raises two questions, which we address in turn: first, whether the present case raised a question of substantive arbitrability, and with it, the presumption against arbitration; and, second, whether the subject matter of the Union's claims is suitable for arbitration.

### A. **Arbitrability**[2]

Because we already offered a detailed discussion of the Supreme Court's precedents concerning arbitrability in Kristian v. Comcast Corp., 446 F.3d 25, 37-41 (1st Cir. 2006), we here limit our discussion to those aspects of arbitrability necessary to resolve the present case.

"The 'question of arbitrability' is a term of art with a narrow scope." Unite Here Local 217 v. Sage Hospitality

---

[2] The term "arbitrability" has been used inconsistently, at times encompassing all prerequisites to and conditions for arbitration. George Bermann, The Gateway Problem in International Commercial Arbitration, 37 Yale J. Int'l L. 1, 10 (2012). As we explain in this section, we here use the term in the narrow sense in which the Supreme Court used it in Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002).

Resources, 642 F.3d 255, 261 (1st Cir. 2011).  The Supreme Court

considers the phrase "question of arbitrability"

> applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

Kristian, 446 F.3d at 38 (quoting Howsam, 537 U.S. at 83-84

(2002)).

As we went on to explain in Kristian, "[t]he cornerstone

here is an assumption about the intent of the contracting parties

to an arbitration agreement, in 'the kind of narrow circumstances

where contracting parties would likely have expected a court to

have decided the gateway matter.'"  446 F.3d at 38 (quoting Howsam,

537 U.S. at 83-84).  And in these narrow circumstances, a

presumption applies that a court, rather than an arbitrator,

decides the gateway matter.  Id. at 38-39.  This presumption can

be defeated, however, by clear and unmistakable evidence that the

parties did mean to submit that matter to arbitration.  Unite

Here, 642 F.3d at 262.

There are two categories of disputes where we apply the

presumption that courts, rather than arbitrators, resolve the

gateway matter:  "(1) disputes 'about whether the parties are

bound by a given arbitration clause'; and (2) disagreements 'about

whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" Id. at 39 (quoting Howsam, 537 U.S. at 84) (clarifying that "[e]xamples of the former include whether an arbitration contract binds parties that did not sign the agreement; and whether an arbitration agreement survived a corporate merger and bound the subsequent corporation. . . . Examples of the latter include whether a labor-management layoff controversy was covered by the arbitration clause of a collective-bargaining agreement; and whether a clause providing for arbitration of various grievances covers claims for damages for breach of a no-strike agreement") (citations omitted).

The kind of arbitrability involved in these two categories -- the kind of arbitrability where we presume that a court decides the gateway matter -- can be referred to as "substantive arbitrability." Howsam, 537 U.S. at 85. The Supreme Court has also found that there is "procedural arbitrability," where the presumption is that an arbitrator -- not a court -- should decide the gateway matter, because that is what the parties would likely have expected. Id. at 84. Examples of "procedural arbitrability" include "procedural questions which grow out of the dispute and bear on its final disposition," and "allegation[s] of waiver, delay, or a like defense to arbitrability." Kristian, 446 F.3d at 39 (quoting Howsam, 537 U.S. at 84).

The present dispute does not raise an issue of substantive arbitrability. The Cover Memorandum entered into by Prime and the Union stated that "Prime shall recognize and continue to process any and all grievances and/or labor arbitrations pending at the time of the closing [of the Asset Purchase Agreement] pursuant to the CBAs referenced herein," and the parties agree that the grievance at issue here was pending at the time of the closing of the Asset Purchase Agreement. Both the Landmark CBA and the Prime CBA contained arbitration clauses. The Providence Superior Court, which authorized Landmark to execute the termination agreement, ruled that "any and all rights and remedies of [the Union] with respect to the employee retirement benefits are reserved." The present dispute between the Union and Prime is indeed about employee retirement benefits. Thus, both parties are bound by the arbitration clause.

This binding arbitration clause also applies to the dispute at issue. Not only is the Cover Memorandum directly applicable to the dispute before us, but all the relevant documents contain broad language. Thus, the Cover Memorandum is applicable to "any and all grievances and/or labor arbitrations," and the arbitration provisions of both the Landmark CBA and the Prime CBA encompass "any dispute between the Hospital and the Union concerning the interpretation, application or meaning of any of

the express provisions of this Agreement."  "The breadth of the arbitration clause, which covers 'any disputes over [the] interpretation or application' of the Agreement, presents an insurmountable impediment to [Prime]'s position."  Unite Here, 642 F.3d at 262.

Still, the district court concluded that the matter before us presented an issue of arbitrability, and was therefore for the court, not for an arbitrator, to decide.  The district court reached this conclusion by reasoning that the Union's claim was one that, per ERISA, could only be brought by the PBGC, and that ERISA's preemptive sweep therefore preempted or barred arbitration.  Prime now urges us to adopt this analysis.  We decline.  As we demonstrate in the next section, a statutory bar to or preemption of arbitration is not an issue of arbitrability -- and ERISA does not bar or preempt the arbitration of this claim. Consequently, this case should proceed to arbitration, and the arbitrator shall decide, inter alia, whether ERISA bars or preempts the Union's claims.

**B.  Suitability of the Subject Matter for Arbitration**

"[T]he [Supreme] Court stated that once it was clear that the 'parties' agreement to arbitrate reached the statutory issues,' a court must then consider 'whether legal constraints external to the parties' agreement foreclosed the arbitration of

those claims.'" Bercovitch v. Baldwin School, Inc., 133 F.3d 141, 148-49 (1st Cir. 1998) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)). The "liberal policy favoring arbitration agreements" informs this inquiry. Id. at 149 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991)). Still,

> there might be some cases in which the arbitral setting is an inappropriate forum for the resolution of statutory claims, but . . . the burden [is] squarely on the plaintiff to prove that this is so. . . . If Congress intended to preclude a waiver [of a judicial forum], that intention would be discoverable in the text or legislative history of the statute, or in an 'inherent conflict' between arbitration and the underlying goals of the statute.

Id. (quoting Gilmer, 500 U.S. at 26) (internal citations omitted).

The question we must resolve then, is whether the text or the legislative history of ERISA shows Congressional intent to preclude a waiver of judicial remedies, and whether an inherent conflict exists between arbitration and the underlying goals of ERISA. This is a different inquiry from the inquiry into arbitrability -- the arbitrability inquiry focuses on the intent of the parties, whereas we must now focus on the intent of Congress.[3]

---

[3] Although, confusingly, the term "arbitrability" has been used to encompass the suitability of the subject matter for arbitration, we here follow the Supreme Court in Howsam, and use the term of art "arbitrability" in its narrow sense. See supra n.1.

-12-

As a preliminary matter, we note that an argument that ERISA in general shows Congressional intent to preclude arbitration is highly implausible. See, e.g., Bird v. Shearson Lehman/American Exp., Inc., 926 F.2d 116, 118-19 (2d Cir. 1991). Because Prime does not advance such an argument, we need not decide the issue here. We also note that the fact that the arbitration agreement is contained in a collective bargaining agreement does not make it any less enforceable. 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 251 (2009) (enforcing arbitration clause in collective bargaining agreement).

Prime, however, argues that the subject matter of the present case is not suitable for arbitration. Prime contends that the Union's claim is preempted or barred by ERISA. Citing 29 U.S.C. §§ 1341(a)(1), 1362(b)-(c), Prime contends that Title IV of ERISA provides the exclusive means by which defined benefit pension plans may be terminated, and also specifies which entities can pursue claims for unfunded liabilities. Citing 29 U.S.C. § 1342(d)(1)(B)(ii), Prime then argues that where, as here, the PBGC initiated the termination, only the PBGC and the statutory trustee of the plan (which Prime states is the PBGC in this case) have the power to collect any amounts due under the plan. Prime also cites 29 U.S.C. § 1367 for the proposition that ERISA provides the mechanism by which the PBGC can enter into settlement

-13-

agreements with plan sponsors to recoup any amounts due under the plan. Prime then shifts its attention to 29 U.S.C. §§ 1322(c) and 1344. Prime believes that these sections would be superfluous if the Union were to prevail on its claim, because these sections provide that the PBGC must allocate to participants and beneficiaries a portion of the unfunded benefit liabilities recovered for the terminated plan, and set out a priority scheme for doing so. Prime then argues that in order for the PBGC to ensure that this priority scheme is followed, the PBGC alone must control all assets that will be allocated to participants and beneficiaries in question. Prime's concern is that if an arbitrator were to rule in favor of the Union, the PBGC would then be unable to fulfill the role ERISA prescribes for it. In this, Prime sees an "inherent conflict" between the purposes of ERISA and arbitration.

The fatal flaw in Prime's reasoning is that it fails to draw a simple, but crucial distinction: the question before us is not whether the Union can bring its claim, but who decides -- court or arbitrator -- whether the Union can bring its claim. Even if we assume, for the sake of argument, that Prime's reading of ERISA is correct, this does not mean that the subject matter of the Union's claims is not suitable for arbitration.[4] For if ERISA

_____

[4] To be clear, we by no means suggest that Prime's reading of

-14-

indeed preempts or bars the Union's claim, an arbitrator can make that determination. And if it is indeed key to the statutory scheme of ERISA that all assets that will be allocated to participants and beneficiaries of the plan be under the control of the PBGC, then, once again, an arbitrator can make that determination.

Prime, however, argues that an arbitrator may reach the wrong conclusion, and thus the purposes of ERISA would not be reached. This is exactly the kind of "outmoded" view of arbitration that the Supreme Court has repeatedly rejected. See, e.g., Rodríguez, 490 U.S. at 481. We are not to presume that an arbitrator will make mistakes. In addition, the judicial review of arbitral decisions, albeit limited, provides adequate protection against errors that an arbitrator may commit. Mitsubishi, 473 U.S. at 638 ("Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed."). Consequently, a subject matter cannot be

---

ERISA is, or is not, correct -- this matter will be for the arbitrator to resolve in the first instance. Rather, we are merely assuming for the sake of argument that Prime's reading of ERISA is correct, only to show that even if it is correct, the Union's claims must still be arbitrated.

unsuitable for arbitration by virtue of a concern that the arbitrator may err.[5]

It is telling that Prime is able to point to only one case in which a court found an "inherent conflict" between arbitration and the purposes of a statute: In re United States Lines, Inc., 197 F.3d 631 (2d Cir. 1999). That case is readily distinguishable from the present one. In United States Lines, the court found that, under the right circumstances, core (but not non-core) bankruptcy matters must be resolved in bankruptcy court, rather than arbitration. Id. at 640. This is because one of the policies that underlies the Bankruptcy Code is the need for a single, centralized proceeding -- and the preferred forum for that proceeding is bankruptcy court. Id. at 640-41. The court cited

---

[5] Prime also argues that a claim may not be arbitrated at all if the arbitral award would require a party to violate the law. In a similar vein, Prime argues that arbitration would be futile if it resulted in an award contrary to federal law, and that an arbitrator cannot order something that is contrary to federal law. Prime cites George Watts & Son, Inc. v. Tiffany & Co., 248 F.3d 577, 580-81 (7th Cir. 2001) in support of this proposition. These arguments, too, are rooted in an outmoded view of arbitration as an inadequate forum for the adjudication of federal claims -- but we are not to presume that an arbitrator will make a wrong determination of the federal claims, and if she does, we will be able to review it. Prime has also failed to demonstrate that the only award an arbitrator could render would be an award of pension benefits (which, on Prime's reading of ERISA, would violate federal law). In other words, we have no reason in the present case to presume that an arbitrator will compel Prime to do anything that is contrary to federal law.

-16-

to, inter alia, the text and legislative history of the Bankruptcy Code -- including direct references to arbitration -- for the proposition that Congress intended to preclude parties from arbitrating certain claims. Id. In the present case, by contract, Prime has not pointed to anything in ERISA or its legislative history that calls for a single, centralized proceeding to decide the Union's claim; Prime has also not pointed to anything in ERISA or its legislative history that would preclude arbitration from being the proper forum for the resolution of that claim.[6]

## IV. Conclusion

Because the case before us belongs in arbitration, we vacate the memorandum and order of the district court, and remand with instructions to grant the Union's motion to compel arbitration. We take care to note that we have resolved only one narrow question: whether this dispute -- including the issue of whether ERISA bars or preempts the Union's claims -- should be resolved by an arbitrator or by a court. Nothing in our opinion

---

[6] The Union also argues that the district court relied on mootness to deny its demand for arbitration. While the Union is likely correct that mootness would present an issue of "procedural arbitrability", and thus presumptively be for the arbitrator to decide, we do not read the district court as having relied on mootness to reach its conclusion, for the district court noted that its "ruling does not rest squarely on the doctrine of mootness".

is intended to intimate in any way how the arbitrator should resolve the dispute -- that is, of course, for the arbitrator to decide.

**<u>Vacated and Remanded.</u>** Costs are awarded to appellant.