*336 Justice Scalia
delivered the opinion of the Court.
Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate “valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U. S. C. §2. We consider whether the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures.
I
In February 2002, Vincent and Liza Concepcion entered into an agreement for the sale and servicing of cellular telephones with AT&T Mobility LLC (AT&T).[1] The contract provided for arbitration of all disputes between the parties, but required that claims be brought in the parties’ “individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.” App. to Pet. for Cert. 61a.[2] The agreement authorized AT&T to make unilateral amendments, which it did to the arbitration provision on several occasions. The version at issue in this case reflects revisions made in December 2006, which the parties agree are controlling.
The revised agreement provides that customers may initiate dispute proceedings by completing a one-page Notice of Dispute form available on AT&T’s Web site. AT&T may *337 then offer to settle the claim; if it does not, or if the dispute is not resolved within 30 days, the customer may invoke arbitration by filing a separate Demand for Arbitration, also available on AT&T’s Web site. In the event the parties proceed to arbitration, the agreement specifies that AT&T must pay all costs for nonfrivolous claims; that arbitration must take place in the county in which the customer is billed; that, for claims of $10,000 or less, the customer may choose whether the arbitration proceeds in person, by telephone, or based only on submissions; that either party may bring a claim in small claims court in lieu of arbitration; and that the arbitrator may award any form of individual relief, including injunctions and presumably punitive damages. The agreement, moreover, denies AT&T any ability to seek reimbursement of its attorney’s fees, and, in the event that a customer receives an arbitration award greater than AT&T’s last written settlement offer, requires AT&T to pay a $7,500 minimum recovery and twice the amount of the claimant’s attorney’s fees.[3]
The Concepcions purchased AT&T service, which was advertised as including the provision of free phones; they were not charged for the phones, but they were charged $30.22 in sales tax based on the phones’ retail value. In March 2006, the Concepcions filed a complaint against AT&T in the United States District Court for the Southern District of California. The complaint was later consolidated with a putative class action alleging, among other things, that AT&T had engaged in false advertising and fraud by charging sales tax on phones it advertised as free.
In March 2008, AT&T moved to compel arbitration under the terms of its contract with the Concepcions. The Concepcions opposed the motion, contending that the arbitration agreement was unconscionable and unlawfully exculpatory *338 under California law because it disallowed classwide procedures. The District Court denied AT&T’s motion. It described AT&T’s arbitration agreement favorably, noting, for example, that the informal dispute-resolution process was “quick, easy to use,” and likely to “promp[t] full or . .. even excess payment to the customer without the need to arbitrate or litigate”; that the $7,500 premium functioned as “a substantial inducement for the consumer to pursue the claim in arbitration” if a dispute was not resolved informally; and that consumers who were members of a class would likely be worse off. Laster v. T-Mobile USA, Inc., 2008 WL 5216255, *11-*12 (SD Cal., Aug. 11,2008). Nevertheless, relying on the California Supreme Court’s decision in Discover Bank v. Superior Court, 36 Cal. 4th 148, 113 P. 3d 1100 (2005), the court found that the arbitration provision was unconscionable because AT&T had not shown that bilateral arbitration adequately substituted for the deterrent effects of class actions. Laster, 2008 WL 5216255, *14.
The Ninth Circuit affirmed, also finding the provision unconscionable under California law as announced in Discover Bank. Laster v. AT&T Mobility LLC, 584 P. 3d 849, 855 (2009). It also held that the Discover Bank rule was not pre-empted by the PAA because that rule was simply “a refinement of the unconscionability analysis applicable to contracts generally in California.” 584 F. 3d, at 857 (internal quotation marks omitted). In response to AT&T’s argument that the Concepcions’ interpretation of California law discriminated against arbitration, the Ninth Circuit rejected the contention that “ ‘class proceedings will reduce the efficiency and expeditiousness of arbitration’” and noted that ‘“Discover Bank placed arbitration agreements with class action waivers on the exact same footing as contracts that bar class action litigation outside the context of arbitration.’ ” Id., at 858 (quoting Shroyer v. New Cingular Wireless Services, Inc., 498 F. 3d 976, 990 (CA9 2007)).
We granted certiorari, 560 U. S. 923 (2010).
*339 h-i HH
The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements. See Hall Street Associates, L. L. C. v. Mattel, Inc., 552 U. S. 576, 581 (2008). Section 2, the “primary substantive provision of the Act,” Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U. S. 1, 24 (1983), provides, in relevant part, as follows:
“A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U.S. C. §2.
We have described this provision as reflecting both a “liberal federal policy favoring arbitration,” Moses H. Cone, supra, at 24, and the “fundamental principle that arbitration is a matter of contract,” Rent-A-Center, West, Inc. v. Jackson, 561 U. S. 63, 67 (2010). In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, Buckeye Check Cashing, Inc. v. Cardegna, 546 U. S. 440, 443 (2006), and enforce them according to their terms, Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U. S. 468, 478 (1989).
The final phrase of § 2, however, permits arbitration agreements to be declared unenforceable “upon such grounds as exist at law or in equity for the revocation of any contract.” This saving clause permits agreements to arbitrate to be invalidated by “generally applicable contract defenses, such as fraud, duress, or unconseionability,” but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue. Doctor’s Associates, Inc. v. Casarotto, 517 U. S. 681, 687 (1996); see also Perry v. Thomas, 482 U. S. 483, 492-493, n. 9 (1987). *340 The question in this case is whether § 2 pre-empts California’s rule classifying most collective-arbitration waivers in consumer contracts as unconscionable. We refer to this rule as the Discover Bank rule.
Under California law, courts may refuse to enforce any contract found “to have been unconscionable at the time it was made,” or may “limit the application of any unconscionable clause.” Cal. Civ. Code Ann. § 1670.5(a) (West 1985). A finding of unconscionability requires “a ‘procedural’ and a ‘substantive’ element, the former focusing on ‘oppression’ or ‘surprise’ due to unequal bargaining power, the latter on ‘overly harsh’ or ‘one-sided’ results.” Armendariz v. Foundation Health Psychcare Servs., Inc., 24 Cal. 4th 83, 114, 6 P. 3d 669, 690 (2000); accord, Discover Bank, 36 Cal. 4th, at 159-161, 113 P. 3d, at 1108.
In Discover Bank, the California Supreme Court applied this framework to class-action waivers in arbitration agreements and held as follows:
“[W]hen the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then . . . the waiver becomes in practice the exemption of the party ‘from responsibility for [its] own fraud, or willful injury to the person or property of another.’ Under these circumstances, such waivers are unconscionable under California law and should not be enforced.” Id., at 162-163, 113 P. 3d, at 1110 (quoting Cal. Civ. Code Ann. § 1668).
California courts have frequently applied this rule to find arbitration agreements unconscionable. See, e. g., Cohen v. DIRECTV, Inc., 142 Cal. App. 4th 1442, 1451-1453, 48 Cal. Rptr. 3d 813, 819-821 (2006); Klussman v. Cross Country *341 Bank, 134 Cal. App. 4th 1283, 1297, 36 Cal Rptr. 3d 728, 738-739 (2005); Aral v. EarthLink, Inc., 134 Cal. App. 4th 544, 556-557, 36 Cal. Rptr. 3d 229, 237-239 (2005).
Ill
A
The Concepcions argue that the Discover Bank rule, given its origins in California’s unconscionability doctrine and California’s policy against exculpation, is a ground that “exist[s] at law or in equity for the revocation of any contract” under FAA §2. Moreover, they argue that even if we construe the Discover Bank rule as a prohibition on collective-action waivers rather than simply an application of unconscionability, the rule would still be applicable to all dispute-resolution contracts, since California prohibits waivers of class litigation as well. See America Online, Inc. v. Superior Court, 90 Cal. App. 4th 1, 17-18, 108 Cal. Rptr. 2d 699, 711-713 (2001).
When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA. Preston v. Ferrer, 552 U. S. 346, 353 (2008). But the inquiry becomes more complex when a doctrine normally thought to be generally applicable, such as duress or, as relevant here, unconscionability, is alleged to have been applied in a fashion that disfavors arbitration. In Perry v. Thomas, 482 U. S. 483 (1987), for example, we noted that the FAA’s pre-emptive effect might extend even to grounds traditionally thought to exist “‘at law or in equity for the revocation of any contract.’” Id., at 492, n. 9 (emphasis deleted). We said that a court may not “rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what .. . the state legislature cannot.” Id., at 493, n. 9.
An obvious illustration of this point would be a ease finding unconscionable or unenforceable as against public policy *342 consumer arbitration agreements that fail to provide for judicially monitored discovery. The rationalizations for such a holding are neither difficult to imagine nor different in kind from those articulated in Discover Bank. A court might reason that no consumer would knowingly waive his right to full discovery, as this would enable companies to hide their wrongdoing. Or the court might simply say that such agreements are exculpatory — restricting discovery would be of greater benefit to the company than the consumer, since the former is more likely to be sued than to sue. See Discover Bank, supra, at 161, 113 P. 3d, at 1108-1109 (arguing that class waivers are similarly one sided). And, the reasoning would continue, because such a rule applies the general principle of unconscionability or public-policy disapproval of exculpatory agreements, it is applicable to “any” contract and thus preserved by §2 of the FAA. In practice, of course, the rule would have a disproportionate impact on arbitration agreements; but it would presumably apply to contracts purporting to restrict discovery in litigation as well.
Other examples are easy to imagine. The same argument might apply to a rule classifying as unconscionable arbitration agreements that fail to abide by the Federal Rules of Evidence, or that disallow an ultimate disposition by a jury (perhaps termed “a panel of twelve lay arbitrators” to help avoid pre-emption). Such examples are not fanciful, since the judicial hostility towards arbitration that prompted the FAA had manifested itself in “a great variety” of “devices and formulas” declaring arbitration against public policy. Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F. 2d 402, 406 (CA2 1959). And although these statistics are not definitive, it is worth noting that California’s courts have been more likely to hold contracts to arbitrate unconscionable than other contracts. Broome, An Unconscionable Application of the Unconscionability Doctrine: How the California Courts Are Circumventing the Federal Arbitration Act, 3 Hastings Bus. L. J. 39, 54, 66 (2006); Randall, Judicial *343 Attitudes Toward Arbitration and the Resurgence of Unconscionability, 52 Buffalo L. Rev. 185,186-187 (2004).
The Concepcions suggest that all this is just a parade of horribles, and no genuine worry. “Rules aimed at destroying arbitration” or “demanding procedures incompatible with arbitration,” they concede, “would be preempted by the FA A because they cannot sensibly be reconciled with Section 2.” Brief for Respondents 32. The “grounds” available under § 2’s saving clause, they admit, “should not be construed to include a State’s mere preference for procedures that are incompatible with arbitration and ‘would wholly eviscerate arbitration agreements.’” Id., at 33 (quoting Carter v. SSC Odin Operating Co., LLC, 237 Ill. 2d 30, 50, 927 N. E. 2d 1207, 1220 (2010)).[4]
We largely agree. Although § 2’s saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA’s objectives. Cf. Geier v. American Honda Motor Co., 529 U. S. 861, 872 (2000); Crosby v. National Foreign Trade Council, 530 U. S. 363, 372-373 (2000). As we have said, a federal statute’s saving clause “ ‘cannot in reason be construed as [allowing] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself.’” American Telephone & Telegraph Co. v. Central Office Telephone, Inc., 524 U. S. 214, 227-228 (1998) (quoting Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 446 (1907)).
*344 We differ with the Concepcions only in the application of this analysis to the matter before us. We do not agree that rules requiring judicially monitored discovery or adherence to the Federal Rules of Evidence are “a far cry from this case.” Brief for Respondents 32. The overarching purpose of the FAA, evident in the text of §§2, 3, and 4, is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings. Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA.
B
The “principal purpose” of the FAA is to “ensur[e] that private arbitration agreements are enforced according to their terms.” Volt, 489 U. S., at 478; see also Stolt-Nielsen S. A. v. AnimalFeeds Int’l Corp., 559 U. S. 662, 681-682 (2010). This purpose is readily apparent from the FAA’s text. Section 2 makes arbitration agreements “valid, irrevocable, and enforceable” as written (subject, of course, to the saving clause); § 3 requires courts to stay litigation of arbitral claims pending arbitration of those claims “in accordance with the terms of the agreement”; and §4 requires courts to compel arbitration “in accordance with the terms of the agreement” upon the motion of either party to the agreement (assuming that the “making of the arbitration agreement or the failure ... to perform the same” is not at issue). In light of these provisions, we have held that parties may agree to limit the issues subject to arbitration, Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 628 (1985), to arbitrate according to specific rules, Volt, supra, at 479, and to limit with whom a party will arbitrate its disputes, Stolt-Nielsen, supra, at 683.
The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute. It can be speci *345 fled, for example, that the decisionmaker be a specialist in the relevant field, or that proceedings be kept confidential to protect trade secrets. And the informality of arbitral proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution. 14 Penn Plaza LLC v. Pyett, 556 U. S. 247, 269 (2009); Mitsubishi Motors Corp., supra, at 628.
The dissent quotes Dean Witter Reynolds Inc. v. Byrd, 470 U. S. 213, 219 (1985), as ‘“rejecting] the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims.’” Post, at 360 (opinion of Breyer, J.). That is greatly misleading. After saying (accurately enough) that “the overriding goal of the Arbitration Act was [not] to promote the expeditious resolution of claims,” but to “ensure judicial enforcement of privately made agreements to arbitrate,” 470 U. S., at 219, Dean Witter went on to explain: “This is not to say that Congress was blind to the potential benefit of the legislation for expedited resolution of disputes. Far from it . . . .” Id., at 220. It then quotes a House Report saying that “the costliness and delays of litigation . . . can be largely eliminated by agreements for arbitration.” Ibid, (quoting H. R. Rep. No. 96, 68th Cong., 1st Sess., 2 (1924)). The concluding paragraph of this part of its discussion begins as follows:
“We therefore are not persuaded by the argument that the conflict between two goals of the Arbitration Act — enforcement of private agreements and encouragement of efficient and speedy dispute resolution — must be resolved in favor of the latter in order to realize the intent of the drafters.” 470 U. S., at 221.
In the present case, of course, those “two goals” do not conflict — and it is the dissent’s view that would frustrate both of them.
Contrary to the dissent’s view, our cases place it beyond dispute that the FAA was designed to promote arbitration. *346 They have repeatedly described the Act as “embod[ying] [a] national policy favoring arbitration,” Buckeye Check Cashing, 546 U. S., at 443, and “a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary,” Moses H. Cone, 460 U. S., at 24; see also Hall Street Assocs., 552 U. S., at 581. Thus, in Preston v. Ferrer, holding pre-empted a state-law rule requiring exhaustion of administrative remedies before arbitration, we said: “A prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results/ ” which objective would be “frustrated” by requiring a dispute to be heard by an agency first. 552 U. S., at 357-358. That rule, we said, would, “at the least, hinder speedy resolution of the controversy.” Id., at 358.[5]
California’s Discover Bank rule similarly interferes with arbitration. Although the rule does not require classwide arbitration, it allows any party to a consumer contract to demand it ex post. The rule is limited to adhesion contracts, Discover Bank, 36 Cal. 4th, at 162-163, 113 P. 3d, at 1110, but the times in which consumer contracts were anything *347 other than adhesive are long past.[6] Carbajal v. H&R Block Tax Servs., Inc., 372 F. 3d 903, 906 (CA7 2004); see also Hill v. Gateway 2000, Inc., 105 F. 3d 1147, 1149 (CA7 1997). The rule also requires that damages be predictably small, and that the consumer allege a scheme to cheat consumers. Discover Bank, supra, at 162-163, 113 P. 3d, at 1110. The former requirement, however, is toothless and malleable (the Ninth Circuit has held that damages of $4,000 are sufficiently small, see Oestreicher v. Alienware Corp., 322 Fed. Appx. 489, 492 (2009) (unpublished)), and the latter has no limiting effect, as all that is required is an allegation. Consumers remain free to bring and resolve their disputes on a bilateral basis under Discover Bank, and some may well do so; but there is little incentive for lawyers to arbitrate on behalf of individuals when they may do so for a class and reap far higher fees in the process. And faced with inevitable class arbitration, companies would have less incentive to continue resolving potentially duplicative claims on an individual basis.
Although we have had little occasion to examine classwide arbitration, our decision in Stolt-Nielsen is instructive. In that case we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation. 559 U. S., at 684-687. We then held that the agreement at issue, which was silent on the question of class procedures, could not be interpreted to allow them because the “changes brought about by the shift from bilateral arbitration to class-action arbitration” are “fundamental.” Id., at 686. This is obvious as a *348 structural matter: Classwide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification, such as the protection of absent parties. The conclusion follows that class arbitration, to the extent it is manufactured by Discover Bank rather than consensual, is inconsistent with the FAA.
First, the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration — its informality — and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. “In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.” 559 U. S., at 685. But before an arbitrator may decide the merits of a claim in classwide procedures, he must first decide, for example, whether the class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the class should be conducted. A cursory comparison of bilateral and class arbitration illustrates the difference. According to the American Arbitration Association (AAA), the average consumer arbitration between January and August 2007 resulted in a disposition on the merits in six months, four months if the arbitration was conducted by documents only. AAA, Analysis of the AAA’s Consumer Arbitration Caseload, online at http://www.adr.org/si.asp7idr: 5027 (all Internet materials as visited Apr. 25, 2011, and available in Clerk of Court’s case file). As of September 2009, the AAA had opened 283 class arbitrations. Of those, 121 remained active, and 162 had been settled, withdrawn, *349 or dismissed. Not a single one, however, had resulted in a final award on the merits. Brief for AAA as Amicus Curiae in Stolt-Nielsen, O. T. 2009, No. 08-1198, pp. 22-24. For those cases that were no longer active, the median time from filing to settlement, withdrawal, or dismissal — not judgment on the merits — was 583 days, and the mean was 630 days. Id., at 24.[7]
Second, class arbitration requires procedural formality. The AAAs rules governing class arbitrations mimic the Federal Rules of Civil Procedure for class litigation. Compare AAA, Supplementary Rules for Class Arbitrations (effective Oct. 8, 2003), online at http://www.adr.org/sp.asp?id=21936, with Fed. Rule Civ. Proc. 23. And while parties can alter those procedures by contract, an alternative is not obvious. If procedures are too informal, absent class members would not be bound by the arbitration. For a class-action money judgment to bind absentees in litigation, class representatives must at all times adequately represent absent class members, and absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class. Phillips Petroleum Co. v. Shutts, 472 U. S. 797, 811-812 (1985). At least this amount of process would presumably be required for absent parties to be bound by the results of arbitration.
We find it unlikely that in passing the FAA Congress meant to leave the disposition of these procedural requirements to an arbitrator. Indeed, class arbitration was not even envisioned by Congress when it passed the FAA in 1925; as the California Supreme Court admitted in Discover Bank, class arbitration is a “relatively recent development.” 36 Cal. 4th, at 163, 113 P. 3d, at 1110. And it is at the very *350 least odd to think that an arbitrator would be entrusted with ensuring that third parties’ due process rights are satisfied.
Third, class arbitration greatly increases risks to defendants. Informal procedures do of course have a cost: The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts. But when damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims. Other courts have noted the risk of “in terrorem” settlements that class actions entail, see, e. g., Kohen v. Pacific Inv. Management Co. LLC, 571 F. 3d 672, 677-678 (CA7 2009), and class arbitration would be no different.
Arbitration is poorly suited to the higher stakes of class litigation. In litigation, a defendant may appeal a certification decision on an interlocutory basis and, if unsuccessful, may appeal from a final judgment as well. Questions of law are reviewed de novo and questions of fact for clear error. In contrast, 9 U. S. C. § 10 allows a court to vacate an arbitral award only where the award “was procured by corruption, fraud, or undue means”; “there was evident partiality or corruption in the arbitrators”; “the arbitrators were guilty of misconduct in refusing to postpone the hearing ... or in refusing to hear evidence pertinent and material to the controversy^] or of any other misbehavior by which the rights of any party have been prejudiced”; or if the “arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award ... was not made.” The AAA rules do authorize judicial review of certification decisions, but this review is unlikely to have much effect given these limitations; review under § 10 focuses on misconduct *351 rather than mistake. And parties may not contractually expand the grounds or nature of judicial review. Hall Street Assocs., 552 U. S., at 578. We find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision.[8]
The Concepcions contend that because parties may and sometimes do agree to aggregation, class procedures are not necessarily incompatible with arbitration. But the same could be said about procedures that the Concepcions admit States may not superimpose on arbitration: Parties could agree to arbitrate pursuant to the Federal Rules of Civil Procedure, or pursuant to a discovery process rivaling that in litigation. Arbitration is a matter of contract, and the FAA requires courts to honor parties’ expectations. Rent-A-Center, West, 561 U. S., at 67-69. But what the parties in the aforementioned examples would have agreed to is not arbitration as envisioned by the FAA, lacks its benefits, and therefore may not be required by state law.
The dissent claims that class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system. See post, at 365. But States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons. Moreover, the claim here was most unlikely to go unresolved. As noted earlier, the arbitration agreement provides that AT&T will *352 pay claimants a minimum of $7,500 and twice their attorney’s fees if they obtain an arbitration award greater than AT&T’s last settlement offer. The District Court found this scheme sufficient to provide incentive for the individual prosecution of meritorious claims that are not immediately settled, and the Ninth Circuit admitted that aggrieved customers who filed claims would be “essentially guarantee^]” to be made whole, 584 F. 3d, at 856, n. 9. Indeed, the District Court concluded that the Concepcions were better off under their arbitration agreement with AT&T than they would have been as participants in a class action, which “could take months, if not years, and which may merely yield an opportunity to submit a claim for recovery of a small percentage of a few dollars.” Laster, 2008 WL 5216255, *12.
* * *
Because it “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” Hines v. Davidowitz, 312 U. S. 52, 67 (1941), California’s Discover Bank rule is pre-empted by the FAA. The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 The Concepcions’ original contract was with Cingular Wireless. AT&T acquired Cingular in 2005 and renamed the company AT&T Mobility in 2007. Laster v. AT&T Mobility LLC, 584 F. 3d 849, 852, n. 1 (CA9 2009).

 That provision further states that “the arbitrator may not consolidate more than one person’s claims, and may not otherwise preside over any form of a representative or class proceeding.” App. to Pet. for Cert. 61a.

 The guaranteed minimum recovery was increased in 2009 to $10,000. Brief for Petitioner 7.

 The dissent seeks to fight off even this eminently reasonable concession. It says that to its knowledge "we have not. . . applied the Act to strike down a state statute that treats arbitrations on par with judicial and administrative proceedings,” post, at 366 (opinion of Breyer, J.), and that “we should think more than twice before invalidating a state law that ... puts agreements to arbitrate and agreements to litigate 'upon the same footing,’ ” post, at 361.

 Relying upon nothing more indicative of congressional understanding than statements of witnesses in committee hearings and a press release of Secretary of Commerce Herbert Hoover, the dissent suggests that Congress “thought that arbitration would be used primarily where merchants sought to resolve disputes of fact. . . [and] possessed roughly equivalent bargaining power.” Post, at 362. Such a limitation appears nowhere in the text of the FAA and has been explicitly rejected by our eases. “Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we [have] nevertheless held ... that agreements to arbitrate in that context are enforceable.” Gilmer v. Interstate/Johnson Lane Corp., 500 U. S. 20, 33 (1991); see also id., at 32-33 (allowing arbitration of claims arising under the Age Discrimination in Employment Act of 1967 despite allegations of unequal bargaining power between employers and employees). Of course the dissent’s disquisition on legislative history fails to note that it contains nothing — not even the testimony of a stray witness in committee hearings — that contemplates the existence of class arbitration.

 Of course States remain free to take steps addressing the concerns that attend contracts of adhesion — for example, requiring class-action-waiver provisions in adhesive agreements to be highlighted. Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms.

 The dissent claims that class arbitration should be compared to class litigation, not bilateral arbitration. Post, at 363. Whether arbitrating a class is more desirable than litigating one, however, is not relevant. A State cannot defend a rule requiring arbitration-by-jui'y by saying that parties will still prefer it to trial-by-jury.

 The dissent cites three large arbitration awards (none of which stems from elasswide arbitration) as evidence that parties are willing to submit large claims before an arbitrator. Post, at 364. Those examples might be in point if it could be established that the size of the arbitral dispute was predictable when the arbitration agreement was entered. Otherwise, all the eases prove is that arbitrators can give huge awards — which we have never doubted. The point is that in class-action arbitration huge awards (with limited judicial review) will be entirely predictable, thus rendering arbitration unattractive. It is not reasonably deniable that requiring consumer disputes to be arbitrated on a elasswide basis will have a substantial deterrent effect on incentives to arbitrate.