Justice THOMAS, concurring.
I join the Court's opinion in full. I write separately to note that the result here is also required by the plain meaning of the Federal Arbitration Act. In AT&T Mobility LLC v. Concepcion, 563 U.S. ----, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), I explained that "the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress." Id., at ----, 131 S.Ct., at 1753 (concurring opinion). In this case, Italian Colors makes two arguments to support its conclusion that the arbitration agreement should not be enforced. First, it contends that enforcing the arbitration agreement "would contravene the policies of the antitrust laws." Ante, at 2309. Second, it contends that a court may "invalidate agreements that prevent *2313 the 'effective vindication' of a federal statutory right." Ante, at 2311. Neither argument "concern[s] whether the contract was properly made," Concepcion, supra, at ----, 131 S.Ct., at 1756 (THOMAS, J., concurring). Because Italian Colors has not furnished "grounds ... for the revocation of any contract," 9 U.S.C. § 2, the arbitration agreement must be enforced. Italian Colors voluntarily entered into a contract containing a bilateral arbitration provision. It cannot now escape its obligations merely because the claim it wishes to bring might be economically infeasible.
Justice KAGAN, with whom Justice GINSBURG and Justice BREYER join, dissenting.
*240 Here is the nutshell version of this case, unfortunately obscured in the Court's decision. The owner of a small restaurant (Italian Colors) thinks that American Express (Amex) has used its monopoly power to force merchants to accept a form contract violating the antitrust laws. The restaurateur wants to challenge the allegedly unlawful provision (imposing a tying arrangement), but the same contract's arbitration clause prevents him from doing so. That term imposes a variety of procedural bars that would make pursuit of the antitrust claim a fool's errand. So if the arbitration clause is enforceable, Amex has insulated itself from antitrust liability-even if it has in fact violated the law. The monopolist gets to use its monopoly power to insist on a contract effectively depriving its victims of all legal recourse.
And here is the nutshell version of today's opinion, admirably flaunted rather than camouflaged: Too darn bad.
That answer is a betrayal of our precedents, and of federal statutes like the antitrust laws. Our decisions have developed a mechanism-called the effective-vindication rule-to prevent arbitration clauses from choking off a plaintiff's ability to enforce congressionally created rights. That doctrine bars applying such a clause when (but only when) it operates to confer immunity from potentially meritorious federal claims. In so doing, the rule reconciles the Federal Arbitration Act (FAA) with all the rest of federal law-and indeed, promotes the most fundamental purposes of the FAA itself. As applied here, the rule would ensure that Amex's arbitration clause does not foreclose Italian Colors from vindicating its right to redress antitrust harm.
The majority barely tries to explain why it reaches a contrary result. It notes that we have not decided this exact case before-neglecting that the principle we have established fits this case hand in glove. And it concocts a special exemption for class-arbitration waivers-ignoring that this *241 case concerns much more than that. Throughout, the majority disregards our decisions' central tenet: An arbitration clause may not thwart federal law, irrespective of exactly how it does so. Because the Court today prevents the effective vindication of federal statutory rights, I respectfully dissent.
I
Start with an uncontroversial proposition: We would refuse to enforce an exculpatory clause insulating a company from antitrust liability-say, "Merchants may bring no Sherman Act claims"-even if that clause were contained in an arbitration agreement. See ante, at 2310. Congress created the Sherman Act's private cause of action not solely to compensate individuals, but to promote "the public interest in vigilant enforcement of the antitrust laws." Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Accordingly, courts will not enforce a prospective waiver *2314 of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637, and n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The same rule applies to other important federal statutory rights. See 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009) (Age Discrimination in Employment Act); Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (Fair Labor Standards Act). But its necessity is nowhere more evident than in the antitrust context. Without the rule, a company could use its monopoly power to protect its monopoly power, by coercing agreement to contractual terms eliminating its antitrust liability.
If the rule were limited to baldly exculpatory provisions, however, a monopolist could devise numerous ways around it. Consider several alternatives that a party drafting an arbitration agreement could adopt to avoid antitrust liability, each of which would have the identical effect. On the front end: The agreement might set outlandish filing fees or establish *242 an absurd (e.g ., one-day) statute of limitations, thus preventing a claimant from gaining access to the arbitral forum. On the back end: The agreement might remove the arbitrator's authority to grant meaningful relief, so that a judgment gets the claimant nothing worthwhile. And in the middle: The agreement might block the claimant from presenting the kind of proof that is necessary to establish the defendant's liability-say, by prohibiting any economic testimony (good luck proving an antitrust claim without that!). Or else the agreement might appoint as an arbitrator an obviously biased person-say, the CEO of Amex. The possibilities are endless-all less direct than an express exculpatory clause, but no less fatal. So the rule against prospective waivers of federal rights can work only if it applies not just to a contract clause explicitly barring a claim, but to others that operate to do so.
And sure enough, our cases establish this proposition: An arbitration clause will not be enforced if it prevents the effective vindication of federal statutory rights, however it achieves that result. The rule originated in Mitsubishi, where we held that claims brought under the Sherman Act and other federal laws are generally subject to arbitration. 473 U.S., at 628, 105 S.Ct. 3346. By agreeing to arbitrate such a claim, we explained, "a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Ibid . But crucial to our decision was a limiting principle, designed to safeguard federal rights: An arbitration clause will be enforced only "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." Id., at 637, 105 S.Ct. 3346. If an arbitration provision "operated ... as a prospective waiver of a party's right to pursue statutory remedies," we emphasized, we would "condemn[ ]" it. Id., at 637, n. 19, 105 S.Ct. 3346. Similarly, we stated that such a clause should be "set [ ] aside" if "proceedings in the contractual forum will be so gravely difficult" that the claimant "will for all practical *243 purposes be deprived of his day in court." Id., at 632, 105 S.Ct. 3346 (internal quotation marks omitted). And in the decades since Mitsubishi, we have repeated its admonition time and again, instructing courts not to enforce an arbitration agreement that effectively (even if not explicitly) forecloses a plaintiff from remedying the violation of a federal statutory right. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ; Vimar Seguros y Reaseguros, S.A. *2315 v. M/V Sky Reefer, 515 U.S. 528, 540, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) ; 14 Penn Plaza, 556 U.S., at 266, 273-274, 129 S.Ct. 1456.
Our decision in Green Tree Financial Corp.-Ala. v. Randolph, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), confirmed that this principle applies when an agreement thwarts federal law by making arbitration prohibitively expensive. The plaintiff there (seeking relief under the Truth in Lending Act) argued that an arbitration agreement was unenforceable because it "create[d] a risk" that she would have to "bear prohibitive arbitration costs" in the form of high filing and administrative fees. Id., at 90, 121 S.Ct. 513 (internal quotation marks omitted). We rejected that contention, but not because we doubted that such fees could prevent the effective vindication of statutory rights. To the contrary, we invoked our rule from Mitsubishi, making clear that it applied to the case before us. See 531 U.S., at 90, 121 S.Ct. 513. Indeed, we added a burden of proof: "[W]here, as here," we held, a party asserting a federal right "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." Id., at 92, 121 S.Ct. 513. Randolph, we found, had failed to meet that burden: The evidence she offered was "too speculative." Id., at 91, 121 S.Ct. 513. But even as we dismissed Randolph's suit, we reminded courts to protect against arbitration agreements that make federal claims too costly to bring.
Applied as our precedents direct, the effective-vindication rule furthers the purposes not just of laws like the Sherman Act, but of the FAA itself. That statute reflects a federal *244 policy favoring actual arbitration-that is, arbitration as a streamlined "method of resolving disputes," not as a foolproof way of killing off valid claims. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Put otherwise: What the FAA prefers to litigation is arbitration, not de facto immunity. The effective-vindication rule furthers the statute's goals by ensuring that arbitration remains a real, not faux, method of dispute resolution. With the rule, companies have good reason to adopt arbitral procedures that facilitate efficient and accurate handling of complaints. Without it, companies have every incentive to draft their agreements to extract backdoor waivers of statutory rights, making arbitration unavailable or pointless. So down one road: More arbitration, better enforcement of federal statutes. And down the other: Less arbitration, poorer enforcement of federal statutes. Which would you prefer? Or still more aptly: Which do you think Congress would?
The answer becomes all the more obvious given the limits we have placed on the rule, which ensure that it does not diminish arbitration's benefits. The rule comes into play only when an agreement "operate[s] ... as a prospective waiver"-that is, forecloses (not diminishes) a plaintiff's opportunity to gain relief for a statutory violation. Mitsubishi, 473 U.S., at 637, n. 19, 105 S.Ct. 3346. So, for example, Randolph assessed whether fees in arbitration would be "prohibitive" (not high, excessive, or extravagant). 531 U.S., at 90, 121 S.Ct. 513. Moreover, the plaintiff must make that showing through concrete proof: "[S]peculative" risks, "unfounded assumptions," and "unsupported statements" will not suffice. Id., at 90-91, and n. 6, 121 S.Ct. 513. With the inquiry that confined and the evidentiary requirements that high, courts have had no trouble assessing the matters the rule makes relevant. And for almost three decades, *2316 courts have followed our edict that arbitration clauses must usually prevail, declining to enforce them in only rare cases. See Brief for United States as Amicus Curiae *245 26-27. The effective-vindication rule has thus operated year in and year out without undermining, much less "destroy[ing]," the prospect of speedy dispute resolution that arbitration secures. Ante, at 2312.
And this is just the kind of case the rule was meant to address. Italian Colors, as I have noted, alleges that Amex used its market power to impose a tying arrangement in violation of the Sherman Act. The antitrust laws, all parties agree, provide the restaurant with a cause of action and give it the chance to recover treble damages. Here, that would mean Italian Colors could take home up to $38,549. But a problem looms. As this case comes to us, the evidence shows that Italian Colors cannot prevail in arbitration without an economic analysis defining the relevant markets, establishing Amex's monopoly power, showing anticompetitive effects, and measuring damages. And that expert report would cost between several hundred thousand and one million dollars.[1] So the expense involved in proving the claim in arbitration is ten times what Italian Colors could hope to gain, even in a best-case scenario. That counts as a "prohibitive" cost, in Randolph 's terminology, if anything does. No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of thousands.
*246 An arbitration agreement could manage such a mismatch in many ways, but Amex's disdains them all. As the Court makes clear, the contract expressly prohibits class arbitration. But that is only part of the problem.[2] THE AGREEMENT ALSO disallows any kind of joinder or consolidation of claims or parties. And more: Its confidentiality provision prevents Italian Colors from informally arranging with other merchants to produce a common expert report. And still more: The agreement precludes any shifting of costs to Amex, even if Italian Colors prevails. And beyond all that: Amex refused to enter into any stipulations that would obviate or mitigate the need for the economic analysis. In short, the agreement as applied in this case cuts off not just class arbitration, but any avenue for sharing, shifting, or shrinking necessary costs. Amex has put Italian Colors to this choice: Spend way, way, way more money than your claim is worth, or relinquish your Sherman Act rights.
So contra the majority, the court below got this case right. Italian Colors proved what the plaintiff in Randolph could not-that a standard-form agreement, taken as a whole, renders arbitration of a claim "prohibitively expensive."
*2317 531 U.S., at 92, 121 S.Ct. 513. The restaurant thus established that the contract "operate[s] ... as a prospective waiver," and prevents the "effective[ ] ... vindicat[ion]" of Sherman Act rights. Mitsubishi, 473 U.S., at 637, and n. 19, 105 S.Ct. 3346. I would follow our precedents and decline to compel arbitration.
II
The majority is quite sure that the effective-vindication rule does not apply here, but has precious little to say about why. It starts by disparaging the rule as having "originated as dictum." Ante, at 2310. But it does not rest on that swipe, and for good reason. As I have explained, see supra, at 2314 - 2315, *247 the rule began as a core part of Mitsubishi : We held there that federal statutory claims are subject to arbitration "so long as " the claimant "effectively may vindicate its [rights] in the arbitral forum." 473 U.S., at 637, 105 S.Ct. 3346 (emphasis added). The rule thus served as an essential condition of the decision's holding.[3] And in Randolph, we provided a standard for applying the rule when a claimant alleges "prohibitive costs" ("Where, as here," etc., see supra, at 2315), and we then applied that standard to the parties before us. So whatever else the majority might think of the effective-vindication rule, it is not dictum.
The next paragraph of the Court's decision (the third of Part IV) is the key: It contains almost the whole of the majority's effort to explain why the effective-vindication rule does not stop Amex from compelling arbitration. The majority's first move is to describe Mitsubishi and Randolph as covering only discrete situations: The rule, the majority asserts, applies to arbitration agreements that eliminate the "right to pursue statutory remedies" by "forbidding the assertion" of the right (as addressed in Mitsubishi ) or imposing filing and administrative fees "so high as to make access to the forum impracticable" (as addressed in Randolph ). Ante, at 2310 - 2311 (emphasis deleted; internal quotation marks omitted). Those cases are not this case, the majority says: Here, the agreement's provisions went to the possibility of "proving a statutory remedy." Ante, at 2311.
But the distinction the majority proffers, which excludes problems of proof, is one Mitsubishi and Randolph (and our *248 decisions reaffirming them) foreclose. Those decisions establish what in some quarters is known as a principle: When an arbitration agreement prevents the effective vindication of federal rights, a party may go to court. That principle, by its nature, operates in diverse circumstances-not just the ones that happened to come before the Court. See supra, at 2314 - 2315. It doubtless covers the baldly exculpatory clause and prohibitive fees that the majority acknowledges would preclude an arbitration agreement's enforcement. But so too it covers the world of other provisions a clever drafter might devise to scuttle even the most meritorious federal claims. Those provisions might deny entry to the forum in the first instance. Or they might deprive the claimant of any remedy. Or they might prevent the claimant from offering the necessary proof to prevail, as in my "no economic testimony" hypothetical *2318 -and in the actual circumstances of this case. See supra, at 2314. The variations matter not at all. Whatever the precise mechanism, each "operate [s] ... as a prospective waiver of a party's [federal] right[s]"-and so confers immunity on a wrongdoer. Mitsubishi, 473 U.S., at 637, n. 19, 105 S.Ct. 3346. And that is what counts under our decisions.[4]
Nor can the majority escape the principle we have established by observing, as it does at one point, that Amex's agreement merely made arbitration "not worth the expense." Ante, at 2307. That suggestion, after all, runs smack into Randolph, which likewise involved an allegation that arbitration, as specified in a contract, "would be prohibitively *249 expensive." 531 U.S., at 92, 121 S.Ct. 513. Our decision there made clear that a provision raising a plaintiff's costs could foreclose consideration of federal claims, and so run afoul of the effective-vindication rule. The expense at issue in Randolph came from a filing fee combined with a per-diem payment for the arbitrator. But nothing about those particular costs is distinctive; and indeed, a rule confined to them would be weirdly idiosyncratic. Not surprisingly, then, Randolph gave no hint of distinguishing among the different ways an arbitration agreement can make a claim too costly to bring. Its rationale applies whenever an agreement makes the vindication of federal claims impossibly expensive-whether by imposing fees or proscribing cost-sharing or adopting some other device.
That leaves the three last sentences in the majority's core paragraph. Here, the majority conjures a special reason to exclude "class-action waiver[s]" from the effective-vindication rule's compass. Ante, at 2311, and n. 4. Rule 23, the majority notes, became law only in 1938-decades after the Sherman Act. The majority's conclusion: If federal law in the interim decades did not eliminate a plaintiff's rights under that Act, then neither does this agreement.
But that notion, first of all, rests on a false premise: that this case is only about a class-action waiver. See ante, at 2311, n. 4 (confining the case to that issue). It is not, and indeed could not sensibly be. The effective-vindication rule asks whether an arbitration agreement as a whole precludes a claimant from enforcing federal statutory rights. No single provision is properly viewed in isolation, because an agreement can close off one avenue to pursue a claim while leaving others open. In this case, for example, the agreement could have prohibited class arbitration without offending the effective-vindication rule if it had provided an alternative mechanism to share, shift, or reduce the necessary costs. The agreement's problem is that it bars not just class actions, but also all mechanisms-many existing long before the *250 Sherman Act, if that matters-for joinder or consolidation of claims, informal coordination among individual claimants, or amelioration of arbitral expenses. See supra, at 2316. And contrary to the majority's assertion, the Second Circuit well understood that point: It considered, for *2319 example, whether Italian Colors could shift expert expenses to Amex if its claim prevailed (no) or could join with merchants bringing similar claims to produce a common expert report (no again). See 554 F.3d 300, 318 (2009). It is only in this Court that the case has become strangely narrow, as the majority stares at a single provision rather than considering, in the way the effective-vindication rule demands, how the entire contract operates.[5]
In any event, the age of the relevant procedural mechanisms (whether class actions or any other) does not matter, because the effective-vindication rule asks about the world today, not the world as it might have looked when Congress passed a given statute. Whether a particular procedural device preceded or post-dated a particular statute, the question remains the same: Does the arbitration agreement foreclose a party-right now-from effectively vindicating the substantive rights the statute provides? This case exhibits a whole raft of changes since Congress passed the Sherman Act, affecting both parties to the dispute-not just new procedural rules (like Rule 23 ), but also new evidentiary requirements *251 (like the demand here for an expert report) and new contract provisions affecting arbitration (like this agreement's confidentiality clause). But what has stayed the same is this: Congress's intent that antitrust plaintiffs should be able to enforce their rights free of any prior waiver. See supra, at 2313 - 2314; Mitsubishi, 473 U.S., at 637, n. 19, 105 S.Ct. 3346. The effective-vindication rule carries out that purpose by ensuring that any arbitration agreement operating as such a waiver is unenforceable. And that requires courts to determine in the here and now-rather than in ye olde glory days-whether an agreement's provisions foreclose even meritorious antitrust claims.
Still, the majority takes one last stab: "Truth to tell," it claims, AT&T Mobility LLC v. Concepcion, 563 U.S. ----, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), "all but resolves this case." Ante, at ----. In that decision, the majority recounts, this Court held that the FAA preempted a state "law conditioning enforcement of arbitration on the availability of class procedure." Ibid. ; see 563 U.S., at ----, 131 S.Ct., at 1748. According to the majority, that decision controls here because "[w]e specifically rejected the argument that class arbitration was necessary." Ante, at 2312.
Where to begin? Well, maybe where I just left off: Italian Colors is not claiming that a class action is necessary-only that it have some means of vindicating a meritorious claim. And as I have shown, non-class options abound. See supra, at 2318 - 2319. The idea that AT&T Mobility controls here depends entirely on the majority's view that this case is "class action or bust." Were the majority to drop that pretense, it could make no claim for AT&T Mobility 's relevance.
And just as this case is not about class actions, AT&T Mobility was not-and *2320 could not have been-about the effective-vindication rule. Here is a tip-off: AT&T Mobility nowhere cited our effective-vindication precedents. That was so for two reasons. To begin with, the state law in question made class-action waivers unenforceable even when a party could feasibly vindicate her claim in an individual *252 arbitration. The state rule was designed to preserve the broad-scale "deterrent effects of class actions," not merely to protect a particular plaintiff's right to assert her own claim. 563 U.S., at ----, 131 S.Ct., at 1745. Indeed, the Court emphasized that the complaint in that case was "most unlikely to go unresolved" because AT & T's agreement contained a host of features ensuring that " aggrieved customers who filed claims would be essentially guaranteed to be made whole." Id., at ----, 131 S.Ct., at 1753 (internal quotation marks and brackets omitted). So the Court professed that AT&T Mobility did not implicate the only thing (a party's ability to vindicate a meritorious claim) this case involves.
And if that is not enough, AT&T Mobility involved a state law, and therefore could not possibly implicate the effective-vindication rule. When a state rule allegedly conflicts with the FAA, we apply standard preemption principles, asking whether the state law frustrates the FAA's purposes and objectives. If the state rule does so-as the Court found in AT&T Mobility -the Supremacy Clause requires its invalidation. We have no earthly interest (quite the contrary) in vindicating that law. Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another federal law, like the Sherman Act here. In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them. Again, then, AT&T Mobility had no occasion to address the issue in this case. The relevant decisions are instead Mitsubishi and Randolph .
* * *
The Court today mistakes what this case is about. To a hammer, everything looks like a nail. And to a Court bent on diminishing the usefulness of Rule 23, everything looks like a class action, ready to be dismantled. So the Court does not consider that Amex's agreement bars not just class actions, but "other forms of cost-sharing ... that could provide *253 effective vindication." Ante, at 2311, n. 4. In short, the Court does not consider-and does not decide-Italian Colors's (and similarly situated litigants') actual argument about why the effective-vindication rule precludes this agreement's enforcement.
As a result, Amex's contract will succeed in depriving Italian Colors of any effective opportunity to challenge monopolistic conduct allegedly in violation of the Sherman Act. The FAA, the majority says, so requires. Do not be fooled. Only the Court so requires; the FAA was never meant to produce this outcome. The FAA conceived of arbitration as a "method of resolving disputes"-a way of using tailored and streamlined procedures to facilitate redress of injuries. Rodriguez de Quijas, 490 U.S., at 481, 109 S.Ct. 1917 (emphasis added). In the hands of today's majority, arbitration threatens to become more nearly the opposite-a mechanism easily made to block the vindication of meritorious federal claims and insulate wrongdoers from liability. The Court thus undermines the FAA no less than it does the Sherman Act and other federal statutes providing rights of action. I respectfully dissent.

The evidence relating to these costs comes from an affidavit submitted by an economist experienced in proving similar antitrust claims. The Second Circuit found that Amex "ha[d] brought no serious challenge" to that factual showing. See, e.g., 667 F.3d 204, 210 (2012). And in this Court, Amex conceded that Italian Colors would need an expert economic report to prevail in arbitration. See Tr. of Oral Arg. 15. Perhaps that is not really true. A hallmark of arbitration is its use of procedures tailored to the type of dispute and amount in controversy; so arbitrators might properly decline to demand such a rigorous evidentiary showing in small antitrust cases. But that possibility cannot disturb the factual premise on which this case comes to us, and which the majority accepts: that Italian Colors's tying claim is an ordinary kind of antitrust claim; and that it is worth about a tenth the cost of arbitration.

The majority contends that the class-action waiver is the only part we should consider. See ante, at 2311, n. 4. I explain below why that assertion is wrong. See infra, at 2318 - 2319.

The majority is dead wrong when it says that Mitsubishi reserved judgment on "whether the arbitration agreement's potential deprivation of a claimant's right to pursue federal remedies may render that agreement unenforceable." Ante, at 2310, n. 2. What the Mitsubishi Court had "no occasion to speculate on" was whether a particular agreement in fact eliminated the claimant's federal rights. 473 U.S., at 673, n. 19, 105 S.Ct. 3375. But we stated expressly that if the agreement did so (as Amex's does), we would invalidate it. Ibid. ; see supra, at 2314 - 2315.

Gilmer and Vimar Seguros, which the majority relies on, see ante, at 2311 - 2312, fail to advance its argument. The plaintiffs there did not claim, as Italian Colors does, that an arbitration clause altogether precluded them from vindicating their federal rights. They averred only that arbitration would be less convenient or effective than a proceeding in court. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31-32, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ; Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). As I have explained, that kind of showing does not meet the effective-vindication rule's high bar. See supra, at 2315 - 2316.

In defense of this focus, the majority quotes the Second Circuit as concluding that "the only economically feasible means" for Italian Colors to enforce its statutory rights "is via a class action." Ante, at 2311, n. 4 (quoting 667 F.3d, at 218; internal quotation marks omitted; emphasis added by the Court). But the Court of Appeals reached that conclusion only after finding that the agreement prohibited all other forms of cost-sharing and cost-shifting. See 554 F.3d 300, 318 (2009). (That opinion was vacated on other grounds, but its analysis continued to inform-indeed, was essential to-the Second Circuit's final decision in the case. See 667 F.3d, at 218.) The Second Circuit therefore did exactly what the majority refuses to do-look to the agreement as a whole to determine whether it permits the vindication of federal rights.